Gaston **FERLAND**, Plaintiff,

v.

**ORANGE GROVES OF FLORIDA, INC., et al., Defendants.**

No. 71-214-ORL-CIV-R.

United States District Court, M. D. Florida, Orlando Division.

April 5, 1974.

Hume F. Coleman, W. Daniel Stephens, Lakeland, Fla., for Gaston Ferland.

Leon H. Handley, Terry S. Freedman, Orlando, Fla., for Gerald Gay and Aline A. Gay, executors of the Estate of Clarence M. Gay, deceased.

Eli H. Subin, Orlando, Fla., for Sam Lewis and Eva G. Lewis.

Stephen M. Stone, Orlando, Fla., for Alfred D. Van, Robert Miller, Orange Groves of Florida, Inc., and Florida Orange Grove Properties, Inc.

Charles R. Fawsett, Orlando, Fla., for Citizens Nat. Bank of Orlando.

William M. Rowland, Jr., Orlando, Fla., for Security Mortgage and Investment Co.

Murray Schwartz, pro se.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

REED, District Judge.

This cause came on for an evidentiary hearing on 21 January 1974, before the

Court on the issues made by the Amended Complaint and Answers and limited by the pretrial order entered on 7 January 1974. Except as hereafter mentioned, the issues relating to the application of the statute of limitation to the individual claims of class members were not susceptible of determination at the hearing, and are hereby reserved for decision at a later stage of the litigation.

On the evidence submitted, the Court makes the following:

## FINDINGS OF FACT

1. Defendant Orange Groves of Florida, Inc. was incorporated under the laws of Florida on 13 May 1964. Defendant Orange Grove Investment Corp. was incorporated under the laws of Florida on 18 March 1966. Defendant Florida Orange Grove Properties, Inc., was incorporated under the laws of Florida on 29 November 1966. All three of these corporations were organized to sell interests in orange groves in Florida.

2. Defendant Orange Groves of Florida, Inc. engaged in the business of selling one-acre lots in an orange grove referred to as "Sunrise Groves." Sunrise Groves was platted and the sales were made by reference to the plat. (See plaintiff's Exhibit 3.) The evidence indicates that from March of 1966 to June of 1966, this corporation executed at least fourteen deeds to individuals, each conveying tracts of one or more acres in size.

3. Defendant Orange Grove Investment Corp. also sold one-acre lots, but in an orange grove referred to as "Sunset Groves." Sunset Groves was platted and the lots were sold by reference to the plat. (See plaintiff's Exhibits 1 and 2.) The evidence indicates that from July 1966 to July 1968, Orange Grove Investment Corp. executed eight deeds conveying to various individuals one or more lots in Sunset Groves.

4. Sunset and Sunrise Groves are located in Martin County, Florida.

5. Florida Orange Grove Properties, Inc. limited its sales to lots in a grove in Brevard County, Florida known as "Sunshine Groves." This grove was platted into one-acre lots and the sales were made by reference to the plat. (See plaintiff's Exhibit 6.) The evidence indicates that from January 1967 to 16 March 1968, this corporation executed approximately forty-four deeds conveying lots in Sunshine Groves to various individuals, one of whom is Gaston Ferland, the plaintiff and class representative.

6. The stock ownership of these three corporations, with the possible exception of Florida Orange Grove Properties, Inc., at the time of the foregoing conveyances, does not clearly appear from the evidence. The activities of these three corporations, however, are unmistakably linked through the common control and efforts of defendants Murray Schwartz, Sam J. Lewis, and Alfred D. Van.

7. The testimony of Murray Schwartz was presented both by deposition and through his personal appearance on the stand. Mr. Schwartz was offered the position of sales manager for Orange Groves of Florida, Inc. by Alfred D. Van. In this capacity, Mr. Schwartz established a sales office in Montreal, Province of Quebec, Canada. This office was established towards the end of 1965 or the beginning of 1966. Later, when Orange Grove Investment Corp. and Florida Orange Grove Properties, Inc. were formed, Mr. Schwartz became their Canadian sales manager also. The same physical premises were used by Mr. Schwartz in Canada for the grove sales of each of the corporations. The name appended to the office was "Orange Groves of Florida Sales Office."

8. The Montreal office contained plats of all the groves dealt in by the three corporations mentioned above and was also the repository for certain advertising material made available to Canadian citizens who became interested in investing in Florida orange groves offered by the three selling companies.

9. The testimony of Messrs. Schwartz, Van, and Lewis indicates that while Mr.

Schwartz was establishing and operating the Montreal office, Alfred D. Van and Sam J. Lewis established an office at 1450 Northeast 123rd Street, North Miami, Florida for the Florida operations of the three corporations.

10. Mr. Schwartz provided the operating link between these two offices. He traveled back and forth almost weekly. Some business records pertaining to the corporations were mailed from Montreal to North Miami, and vice versa, but Mr. Schwartz personally hand-carried mortgages and other recordable documents from Canada to Florida and returned them in the same fashion after recording. This travel was normally accomplished by air. The Court takes judicial notice that such travel passed through various states of the United States and was facilitated by federally owned and operated navigational systems in each such state.

11. Mr. Schwartz testified that the deeds executed by Orange Groves of Florida, Inc. and Orange Grove Investment Corp. to grove buyers were all executed in Canada and brought to the North Miami office.

12. The deeds executed by Florida Orange Grove Properties, Inc., on the other hand, were executed in Florida, usually at the office in North Miami.

13. The deeds issued to the buyers by the three corporations were mailed from the North Miami office to the appropriate county offices for recording. The Court finds that such deeds, after recording, were returned by mail from the recording offices to the corporations' North Miami office and were picked up there by Murray Schwartz or by some other courier and taken back to Montreal from which point the deeds were distributed to the individual grantees named therein.

14. In his capacity as sales manager for the three corporations, Murray Schwartz hired and supervised salesmen who worked out of the Canadian office. He testified that he reported to, and received instructions from, Mr. Alfred D. Van. Mr. Van controlled and super-vised Murray Schwartz's activities in connection with the three corporations.

15. An examination of the deeds referred to in paragraphs *2, 3 and 5* above reveals that Sam J. Lewis executed most of the deeds for Florida Orange Grove Properties, Inc. as its president, although Murray Schwartz executed several such deeds in his capacity as vice-president. The deeds from Orange Groves of Florida, Inc. were all executed by Murray Schwartz as its vice-president. The deeds from Orange Grove Investment Corp. were executed by Robert Miller as its president.

16. With regard to Robert Miller, Murray Schwartz testified, and the Court finds, that Mr. Miller was subordinate to Alfred D. Van and had no responsibility for the Canadian sales. The testimony of Murray Schwartz in this regard was corroborated by that of Mr. Van, who stated that Miller signed deeds at his (Van's) direction and under the direction of Sam J. Lewis.

17. Defendant Eva G. Lewis is the wife of Sam J. Lewis. She was the secretary of Florida Orange Grove Properties, Inc., and in such capacity signed a number of the deeds from that corporation conveying lots in Sunshine Groves. She did not, however, otherwise participate in any of the sales of lots in Sunshine Groves or in the corporate affairs of Florida Orange Grove Properties, Inc., nor did she have the means to exercise control over the management of any of the three corporations.

18. The liability ledgers of the defendant Citizens National Bank, introduced in evidence as plaintiff's Exhibits 82, 83 and 84, reveal that Alfred D. Van and Sam J. Lewis personally endorsed promissory notes in substantial amounts delivered by the three aforementioned corporations to Citizens National Bank to evidence loans made to such corporations from the said bank.

19. From the foregoing evidence, the Court finds that Alfred D. Van, Sam J. Lewis, and Murray Schwartz had the ability to control and direct the Canadian sales activities of Florida Orange

Grove Properties, Inc., Orange Groves of Florida, Inc., and Orange Grove Investment Corp.

20. According to the testimony of Alfred D. Van, the same advertising agent—one Harry Gordon—prepared advertising material for all three corporations and it was sent from Florida to Canada. The mode of its transportation is not clear from the record, but it is reasonable to infer, and the Court finds, that such advertising material was carried from the office in North Miami by Murray Schwartz in the same manner as the deeds were transported.

21. Plaintiff's Exhibit 7 is an English language brochure relating to Florida orange groves in general and particularly those near Indiantown, Martin County, Florida, where Sunrise and Sunset Groves are located. Plaintiff's Exhibit 8 is a French language version of plaintiff's Exhibit 7.

22. Murray Schwartz, in his deposition, identified a pamphlet which was also prepared by Harry Gordon's advertising agency. This pamphlet contains general information about the citrus industry and a chart showing an anticipated return from a one hundred tree unit and was introduced in evidence as plaintiff's Exhibit 9.

23. In addition to the income projection shown in Exhibit 9, another income projection was available to the Canadian buyers at the corporations' office in Montreal, copies of which have been introduced in evidence as plaintiff's Exhibits 121, 128 and 123, the latter being a French language version.

24. The testimony of the plaintiff and the other persons who appeared and testified as representative buyers (all of whom are citizens of Canada and members of the class purportedly represented by the plaintiff) is the only evidence before the Court as to the use made of the advertising material in connection with the sale of the groves.

25. John Sante bought one lot in Sunset Groves from Orange Grove Investment Corp. His deed was dated 25 July 1966 and recorded in the public records of Martin County, Florida on 29 August 1966. Mr. Sante testified that he was told by the salesman with whom he dealt that the land (referring to Sunset Groves) was to be irrigated after a certain number of lots were sold. The witness did not testify whether or not he was told by the salesman the means by which the land was to be irrigated.

26. Andre Pellerin bought five lots in Sunset Groves from Orange Grove Investment Corp. His deed was dated 29 July 1966 and was recorded 30 September 1966 in the public records of Martin County, Florida. Andre Pellerin denied relying on oral representations by salesmen, but said he was "impressed" by plaintiff's Exhibit 123, the sixty-year income projection, and Exhibit 122, which is a general advertising brochure dealing with Martin County groves and Indiantown citrus operations.

27. Margaret Szakonyi bought five lots in Sunset Groves from Orange Grove Investment Corp. Her deed is dated 30 January 1967 and was recorded 5 September 1967 in the public records of Martin County, Florida. She testified that Murray Schwartz told her that there would be irrigation. Her testimony is silent as to the type of irrigation or the time when it was to be provided. She was shown also the sixty-year income projection (Exhibit 128).

28. Gunter Muller bought three lots in Sunrise Groves from Orange Groves of Florida, Inc. His deed is dated 13 May 1966 and was recorded in Martin County public records on 6 June 1966. He testified that he was told that there would be sufficient water and that after the fourth year his return from the lots would cover his mortgage payment. Before he bought, he was shown the sixty-year income projection (Exhibit 121).

29. Alice Boran bought one lot in Sunset Groves from Orange Grove Investment Corp. Her deed is dated 15 January 1967 and was recorded on 7 April 1967 in the public records of Martin County, Florida. She relied on writ-

ten material contained in a composite exhibit introduced in evidence as plaintiff's Exhibit 135. This packet included the sixty-year income projection. Alice Boran, however, denied that oral representations were made to her respecting the investment.

30. Gaston Ferland, the class representative and the named plaintiff, bought five lots in Sunshine Groves (the Brevard County grove) from Florida Orange Grove Properties, Inc. His deed was dated 15 August 1967 and was recorded on 11 December 1967 in the public records of Brevard County, Florida. He testified that he relied on the income projections shown in plaintiff's Exhibit 9. He testified that a salesman for the selling company told him that he would get "a lot of money" on his investment. He did not testify whether or not he was told when his return would be realized or in what amount.

31. Edward Freret bought two lots in Sunshine Groves from Florida Orange Grove Properties, Inc. His deed is dated 17 March 1967 and appears to have been recorded on 5 July 1967 in the public records of Brevard County, Florida. He was told that the lots would have a "big income" in the future, that irrigation was in good operation, and there was no possibility of a freeze. He was also shown Exhibit 122, the general brochure dealing with orange groves in Martin County, Florida.

32. Claude L'Esperance bought two lots in Sunshine Groves from Florida Orange Grove Properties, Inc. and took title to them in his wife's name by a deed dated 17 April 1967 and recorded on 5 July 1967 in the public records of Brevard County, Florida. Claude L'Esperance testified that he was told by the salesman that there had been no frost damage in the area of his grove since weather records had been kept.

33. As illustrated by the testimony of Gaston Ferland and the other lot purchasers, the contract documents used by Florida Orange Grove Properties, Inc., Orange Groves of Florida, Inc., and Orange Grove Investment Corp. consisted of a contract to purchase which contemplated a closing within thirty days; a warranty deed, and a grove care agreement.

34. In the case of sales in Sunshine Groves (in Brevard County, Florida), the grove care agreement was between the buyer and Florida Orange Grove Properties, Inc., whereas in the case of sales in Sunrise and Sunset Groves (in Martin County, Florida), the grove care agreements were between the buyer and Indiantown Grove Service, Inc., a Florida corporation whose president testified by deposition (see plaintiff's Exhibits 11, 12, and 136).

35. A fourth selling corporation has been joined as a defendant herein—Florida Orange Groves Ltd. There were admitted in evidence five deeds from this corporation to various individuals, including Pierre Glomme who was at one time named as a co-plaintiff in this action. (Pierre Glomme, however, opted out of the class which he purported to represent and was dropped as a plaintiff.) These deeds convey property in Sunset Groves. Aside from the bare deeds, there is no substantial evidence in the record as to the selling activity of this corporation or the contractual or advertising documents, if any, used by it in connection with such sales.

36. No registration statement has been filed by Florida Orange Grove Properties, Inc., Orange Groves of Florida, Inc., Orange Grove Investment Corp., or Florida Orange Groves Ltd. with respect to any of the real property sold to the plaintiff or the other class members under the provisions of Chapter 478, Florida Statutes, F.S.A., (see Exhibit 142), or with the United States Securities Exchange Commission pursuant to the provisions of the Securities Act of 1933, as amended (see plaintiff's Exhibits 143, 144, 145 and 146).

37. The defendant Citizens National Bank, a national bank with its principal office in Orlando, Florida, in the regular

course of its business made numerous loans to the defendants Florida Orange Grove Properties, Inc., Orange Grove Investment Corp., and Orange Groves of Florida, Inc. The following is a resume of those loans taken from plaintiff's Exhibits 82, 83 and 84, and the answers filed by the defendant Citizens National Bank on 11 September 1973 to plaintiff's interrogatories filed 25 June 1973:

Florida Orange Grove Properties, Inc.

| Note No. | Amount | Dated | Rate | Type | Secured By |
|---|---|---|---|---|---|
| 18,575A | $ 40,000.00 | 8–4–67 | 8% | Demand Sec. | Assigned mortgages Alfred D. Van & Sam J. Lewis |
| 20,023A | 45,000.00 | 11–13–67 | 8% | Demand Sec. | Assigned mortgages |
| 22,229A | 6,000.00 | 4–11–68 | 8% | Demand Sec. | Security agreement on note—Sam Lewis |
| 24,678A | 65,000.00 | 9–25–68 | 8% | Demand Sec. | Assigned contracts Sam J. Lewis |

Orange Grove Investment Corp.

| Note No. | Amount | Dated | Rate | Type | Secured By |
|---|---|---|---|---|---|
| 13,701A | $131,700.00 | 8–29–66 | 7% | Demand Sec. | Assigned mortgages on orange groves Sam J. Lewis Alfred D. Van & Robert Miller |
| 14,073A | 75,000.00 | 9–23–66 | 8% | Demand Sec. | Assigned mortgages Sam J. Lewis, Robert Miller & Alfred D. Van |
| 14,578 | $ 22,000.00 | 10–31–66 | 8% | Demand Sec. | Assigned mortgages— Robert Miller & Alfred D. Van (1st advance) |
| (2nd advance) | 10,000.00 | 11–15–66 | 8% | | |
| (3rd advance) | 20,902.00 | 11–28–66 | 8% | | |
| (4th advance) | 30,000.00 | 12–13–66 | 8% | | |

Orange Groves of Florida, Inc.

| Note No. | Amount | Dated | Rate | Type | Secured By |
|---|---|---|---|---|---|
| 5,746A | $ 12,500.00 | 5–31–65 | 6% | Demand Sec. | Assignment of mortgage Alfred D. Van & Sam J. Lewis |
| 6,029A | 10,000.00 | 6–14–65 | 6% | Demand Sec. | Pledge of Escrow Agreement |
| 6,356A | 100,000.00 | 7–1–65 | 6% | Time Sec. | Assignment of note & mortgage |
| 7,797A | 2,781.00 | 9–20–65 | 8% | Demand Unsec. | |
| 11,333A | 27,500.00 | 4–5–66 | 6% | Demand Unsec. | |
| 11,493A | 100,000.00 | 4–15–66 | 8% | Time Sec. | Assignment of mortgage Sam J. Lewis & Alfred D. Van |
| 11,494A | 50,000.00 | 4–15–66 | 8% | Time Sec. | Assignment of mortgage Sam J. Lewis & Alfred D. Van |
| 12,427A | 115,000.00 | 6–8–66 | 8% | Demand Sec. | Assignment of mortgages Sam J. Lewis & Alfred D. Van |
| 12,602A | 32,000.00 | 6–17–66 | 8% | Demand Sec. | Assignment of mortgages Sam J. Lewis & Alfred D. Van |
| 12,970A | 44,000.00 | 7–11–66 | 8% | Time Sec. | Mortgages— Sam J. Lewis & Alfred D. Van |
| 13,320A | 23,000.00 | 8–6–44 | 8% | Time Sec. | Assignment of mortgages Sam J. Lewis & Alfred D. Van |
| 16,910A | 74,347.65 | 4–17–67 | 8% | Demand Sec. | Assignment of mortgages Sam J. Lewis & Alfred D. Van |

(This was used to pay off and renew time sec. note number 11,493)

Orange Groves of Florida, Inc.—Continued

| Note No. | Amount | Dated | Rate | Type | Secured By |
|---|---|---|---|---|---|
| 16,911A | 49,301.34 (This was used to pay off and renew note number 11,494) | 4–17–67 | 8% | Demand Sec. | Assignment of mortgages Sam J. Lewis & Alfred D. Van |
| 18,470A | 35,342.33 (This was used to pay off time secured note number 12,970) | 7–24–67 | 8% | Demand Sec. | Assignment of mortgages Sam J. Lewis & Alfred D. Van |
| 18,549A | 20,429.13 (This was used to pay off time secured note number 13,320) | 8–4–67 | 8% | Demand Sec. | Assignment of mortgages Sam J. Lewis & Alfred D. Van |

38. Some of the foregoing loans were personally endorsed by the defendants Sam J. Lewis and Alfred D. Van. Some were secured by assignments of mortgages given to the defendants by some of the lot purchasers in Sunset, Sunrise and Sunshine Groves. Sam J. Lewis testified that the loan proceeds were used to develop the groves. The evidence, however, does not indicate what improvements were made with the proceeds from any particular loan. No loans were made directly or indirectly by Citizens National Bank to any lot purchaser to enable him to purchase a grove lot.

39. C. M. Gay was the president and chairman of the board of directors of Citizens National Bank from 16 October 1951 to 15 October 1971. Mr. Gay resigned as president of Citizens National Bank on 15 October 1971, but remained as chairman of the board until his death on 25 June 1972. The personal representatives of C. M. Gay's estate, Aline A. Gay and Gerald A. Gay, have been joined herein in that capacity.

40. On 12 January 1967, C. M. Gay and his wife conveyed to the defendant Florida Orange Grove Properties, Inc., by a special warranty deed, the real property in Brevard County, Florida, which was thereafter platted by Florida Orange Grove Properties, Inc. as Sunshine Groves. (See plaintiff's Exhibit 6.)

41. Nathan Loeb, a Florida attorney with an office in Orlando, Florida, testified that he was retained by Alfred D. Van to form Florida Orange Grove Properties, Inc. According to Mr. Loeb, when C. M. Gay sold the land to Florida Orange Grove Properties, Inc., he took back a note and a purchase money mortgage. The mortgage was never recorded. This testimony as to Gay's security interest in the land was corroborated by the testimony of Alfred D. Van.

42. Nathan Loeb further testified that he was never advised that C. M. Gay had any interest in Florida Orange Grove Properties, Inc. This testimony is corroborated by the corporate records of Florida Orange Grove Properties, Inc. (plaintiff and Eva Lewis' Exhibit 2) which indicate that C. M. Gay was neither an officer nor a director of that corporation and that the stock of the corporation was to be issued to Sam J. Lewis (250 shares) and Minna Van (230 shares), the latter being the wife of Alfred D. Van. Stock certificates in evidence (plaintiff's Exhibits 72, 73 and 74) indicate that the stock was issued

250 shares to Sam J. Lewis and 250 shares to Minna Van.

43. Murray Schwartz testified (by deposition) that C. M. Gay gave him no instructions and that no one from Citizens National Bank participated in the grove sales in Canada to the Canadians represented by the plaintiff. This testimony was corroborated by that of Alfred D. Van to the effect that C. M. Gay had nothing to do with the sales by Orange Groves of Florida, Inc., Orange Grove Investment Corp., and Florida Orange Grove Properties, Inc.

44. Florida Orange Grove Properties, Inc., established a checking account at Citizens National Bank. On at least one occasion, C. M. Gay caused a cashier's check to be written on that account payable to the Brevard County Tax Collector to pay off a tax lien imposed by the San Sebastian Drainage District apparently on Sunshine Groves. (See plaintiff's Exhibit 96.) On another occasion, C. M. Gay received a check drawn on that account by Alfred D. Van for $25,000.00 (see plaintiff's Exhibit 13). The purpose for the issuance of this check does not adequately appear from the testimony of Van or otherwise.

45. Byron D. Gay, the president of defendant Security Mortgage & Investment Company, testified that the business of that corporation was initially to buy and sell mortgages and later to invest in real estate. Byron D. Gay is the nephew of C. M. Gay. Byron D. Gay testified that C. M. Gay never owned any interest in Security Mortgage & Investment Company, although C. M. Gay was the financial adviser to Security Mortgage & Investment Company. On C. M. Gay's suggestion, Security Mortgage & Investment Company loaned to Florida Orange Grove Properties, Inc. $100,000.00 on 5 February 1969. (See plaintiff's Exhibit 99.) To secure this loan, Florida Orange Grove Properties, Inc. assigned notes and mortgages executed to it by lot purchasers in Sunshine Groves. The loan from Security Mortgage & Investment Company was facilitated by a loan to Security Mortgage & Investment Company from a commercial bank in Miami, which latter loan was arranged by C. M. Gay who pledged personally owned stock to secure its repayment. (See plaintiff's Exhibits 149 through 156.)

46. Byron D. Gay denied that Security Mortgage & Investment Company participated in the sale of any land of Florida Orange Grove Properties, Inc.

47. The Court finds that C. M. Gay was interested in Florida Orange Grove Properties, Inc. only as a creditor and a representative of a creditor—Citizens National Bank. In this latter capacity, he was also interested in the success of Orange Grove Investment Corp. and Orange Groves of Florida, Inc. Neither C. M. Gay, nor Citizens National Bank, nor Security Mortgage & Investment Company participated in, by financing or otherwise, the sales conducted in Canada by Orange Groves of Florida, Inc., Orange Grove Investment Corp., and Florida Orange Grove Properties, Inc. through Murray Schwartz. Neither C. M. Gay, nor Citizens National Bank, nor Security Mortgage & Investment Company had a legal (contractual) right to influence or control such sales. The activities of C. M. Gay in connection with the checking account of Florida Orange Grove Properties, Inc. and his later reacquisition from Florida Orange Grove Properties, Inc., through the offices of Byron D. Gay, of certain unsold lots in Sunshine Groves are all consistent with his position as a creditor and a representative of a creditor.

48. With respect to this latter transaction, the evidence indicates that on the 5th of December 1969, on the 16th of March 1970, and on the 12th of May 1971, Florida Orange Grove Properties, Inc. executed deeds to Security Mortgage & Investment Company of certain lots in Sunshine Groves which had not theretofore been sold to investors. Byron D. Gay testified that he acquired these deeds at the request of C. M. Gay and considered that the properties conveyed by the deeds were held by Security Mortgage & Investment Company in trust for C. M. Gay. The Court finds from this

testimony that these three transactions, taken collectively, were simply an extrajudicial foreclosure of the security interest held by C. M. Gay in Sunshine Groves as security for the purchase price thereof owed C. M. Gay by Florida Orange Grove Properties, Inc.

49. The caretaking of Sunset and Sunrise Groves was performed by a corporate caretaker operating under the name of Indiantown Grove Service, Inc., whose principal officer was one Carl L. Windham from Okeechobee, Florida. The grove care contracts, as illustrated by the testimony of the class members, were between the individual lot purchasers and Indiantown Grove Service, Inc. When said contracts were signed, Mr. Windham had been in various aspects of the citrus business approximately twenty years, and was by reason of his experience competent as a citrus grove caretaker and citrus nurseryman.

50. The caretaking of Sunshine Groves was handled by Indian River Orange Groves, Inc. Exhibit 75 is a contract between Florida Orange Grove Properties, Inc. and Indian River Orange Groves, Inc. for the caretaking of Sunshine Groves. The individual investors in Sunshine Groves had a caretaking agreement which generally paralleled that reflected in Exhibit 75. Their agreement, however, was directly with their vendor, Florida Orange Grove Properties, Inc. The actual work of caretaking was performed by Indian River Orange Groves, Inc. under the terms of the contract introduced as Exhibit 75. Indian River Orange Groves, Inc. was a competent and experienced grove caretaker at the time Exhibit 75 was executed.

51. The general advertising brochure that was available in the Montreal office of the three selling corporations (plaintiff's Exhibit 7) contained the following statement:

"The Indiantown area is fortunate in having a number of professional caretaking-marketing organizations which contract to handle every detail of the process of growth, packing and marketing, including fertilization, cultivation, pruning, spraying, dusting and complete grove maintenance, etc. A typical such care-taking operation has many hundreds of thousands of dollars invested in equipment and highly skilled personnel, and brings to today's competitive field a combination of hundreds of years of knowledge and technique and the finest mechanical tools and methods of modern technology. This careful, capable, efficient management is further backed by a bond for your protection issued by a nationwide insurance company, and assures you of the best possible care for your investment, at the lowest possible cost and highest rate of return . . ."

52. As reflected by the deeds in evidence, some of the deeds contained a restriction reading in substance as follows:

"To use the above described lands as commercial citrus groves, only. To erect no buildings or structures of any type or kind on said lands, so long as at least fifty (50) percent of the lands in said subdivision are devoted to the growing of citrus products, after said lands have been first planted as citrus groves." (See plaintiff's Exhibit 136 and plaintiff's Exhibit 11.)

However, plaintiff's Exhibit 7 contains the following statement under a heading entitled "What Do You Receive When You Become a Grove-Owner":

"You receive immediately full title to your property, with all rights to do with it as you wish . . . ."

Not a single purchaser testified before the Court that he or she was mislead by the statement in the advertising material or assumed therefrom that the land would or could be used for any purpose other than an integral part of a citrus grove. In fact, Gaston Ferland, the class representative, expressly testified that he was not complaining about the use restriction contained in the deed to him.

53. Plaintiff's Exhibit 7 contains certain extremely optimistic statements

with regard to profits from orange groves in general. For example, on the second page of plaintiff's Exhibit 7, the statement will be found to the following effect:

". . . It is always there, always producing, always saleable and always profitable!".

The "it" referred to in the sentence is "the orange" which is referred to in the preceding text. Shortly after the foregoing statement, the following is found on page 2 of the plaintiff's Exhibit 7:

". . . They are marketed, sold, delivered, collected for whether you are there or not, and your yearly profit is paid to you directly by the purchaser of your fruit, no matter where you are!"

On page 4 of plaintiff's Exhibit 7, the following is found in numbered paragraph 3 on that page:

". . . not only are you protected against hidden costs, you are also guaranteed that your trees will live and be productive, or they will be replaced at absolutely no cost to you!"

54. The evidence reflects that all of the groves had drainage ditches or canals. The evidence also gives rise to a reasonable inference that at least at some point in time, irrigation pumps were on Sunrise and Sunset Groves (Byron D. Gay's testimony) and also on Sunshine Groves (Chancellor Hannon's testimony). Carl Windham, whose deposition was admitted into evidence, testified on the other hand that he saw no irrigation system put in Sunset or Sunrise Groves. He testified that he was told by Mr. Schwartz and by Mr. Van that an irrigation system would be established after the grove operation was started. John Sante, one of the representatives of the class, gave testimony which corroborated that of Windham. Mr. Sante testified that he was told by a salesman whose identity was not revealed in his testimony, that the land—apparently meaning the land in Sunset or Sunrise Groves—was to be irrigated after a certain number of lots were sold. However, from the testimony of Carl Windham, Dr. Ralph Miller, and Chancellor E. Hannon, the Court finds that no permanent system for irrigating the groves was ever established either in Sunset, Sunrise, or Sunshine Groves.

55. The evidence simply does not support the assertion that all the class members who financed their purchases were assured income from the groves which after the fourth year of planting would cover all future payments on the mortgages. One witness, Gunter Muller, did testify that he was told by a salesman that after three years he would have a small return on his grove and after the fourth year he would have enough income to meet the mortgage payments. The evidence does not support the assertion that this representation or a similar type representation was made to all persons who bought lots and financed them by a mortgage. Nor does the evidence support the assertion that such a representation was made in the form of a promise or a guarantee as to the adequacy of income. The sales literature, particularly Exhibit 7, does not reflect any such representation.

56. Plaintiff's Exhibits 128, 121 and 123, the French language version of plaintiff's Exhibits 121 and 128, and plaintiff's Exhibit 9 each contain projections of income from, in the case of Exhibits 128, 121 and 123, a one-acre grove, and in the case of Exhibit 9, a 100-tree unit. With regard to the figures reflected in plaintiff's Exhibits 128 and 121, plaintiff's expert witness Chancellor E. Hannon, a plant pathologist, testified that in his opinion the income figures reflected for ages three to six are reasonably accurate, but for the years thereafter are inflated. Mr. Hannon did testify, however, that the origin of the figures is a statistical report prepared by Dr. Zack Savage, a respected agricultural economist associated with the University of Florida in Gainesville. According to Mr. Hannon, the figures reflected in the sixty-year projection are generally accepted for groves in the "Ridge area" of Florida, but are not necessarily acceptable for groves lying in

the location of Sunset, Sunrise and Sunshine Groves. While Mr. Hannon was obviously an expert in plant pathology, he was not shown by the evidence to have been an expert in the economics of citrus production.

## CONCLUSIONS OF LAW

■ 1. The orange grove interests sold by the defendants Orange Groves of Florida, Inc., Florida Orange Grove Investment Corp., and Florida Orange Grove Properties, Inc. (hereafter referred to as Selling Corporations) were securities within the meaning of that term as used in the Securities Act of 1933, and the Securities Exchange Act of 1934. The rationale of Securities and Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), cited with approval, Roe v. United States, 287 F.2d 435, 438 (5th Cir. 1961), is controlling on this issue. The plaintiff has not established by a preponderance of the evidence that the orange grove interests sold by Florida Orange Groves Ltd. were sold in such manner and under such terms that the interests could be considered as securities for purposes of said Acts.

■ 2. Counsel for the defendants Sam J. Lewis and Eva Lewis has contended that because the plaintiff and the members of the class which plaintiff represents were all residents or citizens of Canada at the time of their respective "security" purchases, the transactions are beyond the reach of the Securities Act of 1933 and the Securities Exchange Act of 1934. This contention is not supported by the language of either statute or any judicial construction thereof which pertains to the factual situation before the Court. Consequently, the Court concludes that it has subject matter jurisdiction under 15 U.S.C. §§ 77v and 78aa over Counts I, II, and III of the Amended Complaint, as amended by the Amendment thereto filed 12 March 1973. The Court also concludes that it has pendent jurisdiction over the claims asserted in Counts IV and V of the Amended Complaint, as thus amended. The Court has jurisdiction over the parties to this action, except Pierre Glomme who has been dropped as a party plaintiff, and Leonard P. Francis who has heretofore been dismissed on a motion for summary judgment.

3. Because no registration statement has been filed by any of the Selling Corporations with the Securities and Exchange Commission and the said corporations used the United States Mails and other instruments of transportation in interstate commerce to sell the grove interests, such sales violated 15 U.S.C. § 77e(a). (See Findings of Fact, paragraph *33*, supra.)

■ 4. As a consequence of the violation of § 77e(a) noted in paragraph 3 above, the Selling Corporations incurred civil liability to the plaintiff and the members of the class which he represents under the provisions of 15 U.S.C. § 77l(1). 15 U.S.C. § 77m, however, provides that no action may be maintained to enforce a liability created by § 77l(1) unless brought within one year after the violation upon which it is based. From the deed records in evidence, it appears that no sales were made by any of the Selling Corporations to any member of the class after 29 May 1969. This action was commenced on 12 October 1971. The statute of limitations, therefore, as demonstrated by the plaintiff's own evidence, has barred the claim of the plaintiff and the class members predicated on a violation of § 77l(1), as asserted in Count I of the Amended Complaint.

5. Count I of the Amended Complaint also charges that the Selling Corporations are liable to the plaintiff and the class for a violation of § 77l(2) which, in pertinent part, provides as follows:

"Any person who—

. . . . . .

(2) offers or sells a security . . . ., by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of

a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . ., shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, . . . ."

In paragraph 23 of the Amended Complaint the plaintiff alleges five specific misrepresentations as a predicate for his claim of a violation of § 77l(2).

■ Paragraph 23(a) of the Amended Complaint alleges:

"(a) Defendant corporations asserted prior to the real estate closings that a professional caretaker-marketing organization would caretake the groves and market the fruit. These companies were represented as having hundreds of thousands of dollars invested in equipment and highly skilled personnel with the company to be manned by careful, capable and efficient management backed by a bond issued by a nation-wide insurance company for the protection of plaintiffs and the other members of the class."

The first sentence of paragraph 23(a) of the Amended Complaint was proved. The evidence, however, also shows that professional caretaking organizations were made available to the plaintiff and the class through the efforts of the Selling Corporations. (See paragraphs 49 and 50 of the Findings of Fact, supra.)

The second sentence in paragraph 23(a) was not proved. What the defendants represented regarding the available caretaking organizations appears in plaintiff's Exhibit 7 and is quoted in paragraph 51 of the Findings of Fact above. No evidence was offered by the plaintiff to show whether or not a typical caretaking organization did or did not meet the description contained in plaintiff's Exhibit 7. Furthermore, no

evidence was produced which would tend to indicate whether or not, assuming a typical caretaking organization did not meet such specifications, this would be a material misrepresentation in the sense that it would have influenced the judgment of an average investor.

■ Paragraph 23(b) of the Amended Complaint alleges:

"(b) The purchasers of the real estate were to receive full title to property with no restrictions on their right to use the property as they desired. However, many of the members of the class received deeds which contained restrictions on the manner in which the property could be used."

The evidence reflects that there was a variance between what the lot purchasers were told they would get by way of an unencumbered title and what some of the class members did get. (See paragraph 52 of the Findings of Fact, supra.) If, however, this variance which occurred because some of the deeds to some of the class members restricted the land use to citrus production can be considered to be a misrepresentation of a "fact," it is not a misrepresentation of a "material fact." The grove lots were offered as property to be maintained as income-producing orange groves. It is basically for this reason that the grove interests can be considered a "security." The buyers understood that what they were purchasing was land for an agricultural use, to-wit, orange growing. The misrepresentation, if one was proved, was, therefore, not such that it would have influenced a reasonable investor under the facts of the present case. See Johns Hopkins University v. Hutton, 422 F.2d 1124, 1128-1129 (4th Cir. 1970) and authorities cited therein.

■ The third misrepresentation charged to the defendants is alleged in paragraph 23(c) of the Amended Complaint as follows:

"(c) The purchasers were guaranteed profits from the citrus crops that were to be harvested from the trees

planted on the real estate purchased by plaintiffs and the other members of the class."

While the defendants' brochure, plaintiff's Exhibit 7, paints a roseate view of the citrus industry (see Findings of Fact, paragraph *53* supra), its representations should be assessed for materiality on the basis of their assumed impact on the average prudent investor, Johns Hopkins University v. Hutton, supra, not on the subjective views of investors formulated after the investment failed to achieve their individual objectives. Plaintiff's Exhibit 7, taken as a whole, would not, in the opinion of the Court, be construed by the average prudent investor interested in an agricultural type investment as a guarantee of future profits because: (1) the language of Exhibit 7 is not reasonably susceptible of being construed as a contractual guarantee; (2) Exhibit 7 expressly informs the prospect as to what he gets for his money in the following terms:

". . .

1. You receive immediately full title to your property, with all rights to do with it as you wish. This document is known as a Warranty Deed, the highest form of title deed obtainable in the United States, and is the same document which protects you (sic) ownership of your home. You not only receive full rights of ownership and use, but also a Title Insurance Policy taken out by the seller, wherein a major Insurance company undertakes to safeguard your rights in perpetuity.

2. You receive a guarantee of 100 trees per acre. These trees are not only guaranteed to be prime citrus-bearing stock, but have in fact satisfied the rigid laws applied by the Agriculture Department of the State of Florida and have been carefully tended in qualified nursery for the first 2 years of life, and have been inspected and certified so by the Agriculture Department. These trees are yours . . . owned solely by you, and you are the only person entitled to reap the benefit of their harvest.";

and (3) given the nature of the investment and its dependence on weather and other risks of nature, an average prudent investor would recognize any guarantee of profits as a manifest impossibility.

The evidence also indicates that the Selling Corporations used income projections as a part of their sales literature. (See paragraphs 22 and 23, Findings of Fact.) The evidence does not indicate, however, that these projections were presented to the public as guarantees. (Nor does the complaint allege such.) With regard to the income projections, the Court has not overlooked the possibility that such projections could themselves be viewed as misrepresentations of "fact." Predictions as to future events may implicitly represent to the investor that they have a reasonable basis in fact. See 3L. Loss, Securities Regulation, Ch. 9B p. 1437 (2d Ed. 1961). See also Berko v. Securities and Exchange Commission, 316 F.2d 137, 141 (2d Cir. 1963); cf. United States v. Herr, 338 F.2d 607, 610 (7th Cir. 1964), cert. denied, 382 U.S. 999, 86 S.Ct. 563, 15 L.Ed.2d 487. The preponderance of the evidence before the Court, however, does not indicate that the income projections were made without a reasonable basis in fact, and neither does the complaint allege that the income projections were so made. (See paragraph 56 of the Findings of Fact, supra.)

In paragraph 23(d) of the Amended Complaint the plaintiff alleges:

"(d) The purchasers were advised the real estate would be irrigated and drained and that the purchasers would have a proportionate interest in common with the other owners of lots in the subdivisions to the pumps, pipes, pumping facilities and the use thereof."

While the evidence does not indicate that a general representation was made to all

members of the class, a representation oral in nature was made to at least some of the class members that a system for irrigation would at some time in the future be installed in the groves. The evidence indicates that although all the groves had drainage ditches and irrigation pumps at one time or another, no "permanent" system for irrigation was installed in the groves. A promissory representation, whether asserted in a common law fraud action, an action under 15 U.S.C. § 77l(2), or an action under the Securities and Exchange Commission Rule 10b–5, 17 CFR § 240.10b–5, should only be considered a misrepresentation of fact where the evidence shows that the promise was made without the intent to perform. See L. Loss, supra. See also United States v. Grayson, 166 F.2d 863 (2d Cir. 1948), and United States v. Herr, supra. In view of the evidence as to what was apparently done in performance of the promise, the evidence does not establish that the "promise" was made without the intention to perform or with the intention to mislead or deceive.

■ The fifth and final allegation of fraud contained in paragraph 23(e) alleges:

"(e) The purchasers who financed their purchases through mortgages to defendants were assured income from the groves after the fourth year of planting the citrus trees would cover all future payments on the mortgages."

The evidence does not meet the allegation that all persons who financed their grove purchases were "assured" that after the grove's fourth year, the return on the grove would cover the mortgage payments. (See paragraph 55, Findings of Fact, supra.) Aside from this factual hiatus which actually goes to the propriety of the action as a class action, the alleged misrepresentation was in the nature of a prediction which was not shown by the evidence to have been made without some reasonable basis in fact. Thus, the plaintiff's proof in support of the allegation suffers from the same defect as his proof surrounding the income projections noted above.

■ 6. On the same operative facts alleged in Count I to support a violation of 15 U.S.C. § 77l, the plaintiff under Count II of the Amended Complaint claims a right to recission and damages for a violation of 15 U.S.C. § 77q. In the opinion of the Court, § 77q was not intended to give rise to a private right of action. Had Congress so intended, it would have structured the language of § 77q in a manner similar to that employed in § 77l and would have provided an appropriate statute of limitations. Any other construction of § 77q gives rise to the anomaly of having to inject a state statute of limitation into a federal statute in which Congress has already provided a very precise limitation period (§ 77m) for use in connection with the only expressly created private right of action. The foregoing conclusion is supported by Dyer v. Eastern Trust and Banking Company, 336 F.Supp. 890 (D. Me.1971), and, by analogy, the recent decision of the United States Supreme Court in National Railroad Passenger Corporation v. National Association of Railroad Passengers, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). The issue before the Court in the latter was whether or not the Rail Passenger Service Act of 1970, 84 Stat. 1330, 45 U.S.C. § 501 et seq., created a private right of action enforceable by the plaintiff. The Court stated, at page 457 of its opinion:

". . . It goes without saying, however, that the inference of such a private cause of action not otherwise authorized by the statute must be consistent with the evident legislative intent and, of course, with the effectuation of the purposes intended to be served by the Act.

A frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies. . . . Since the Act creates a pub-

lic cause of action for the enforcement of its provisions and a private cause of action only under very limited circumstances, this maxim would clearly compel the conclusion that the remedies created in § 307(a) are the exclusive means to enforce the duties and obligations imposed by the Act. . . ." and concluded the issue in the negative.

 7. Count III of the Amended Complaint charges the Selling Corporations with a violation of Rule 10b–5 adopted by the Securities and Exchange Commission under the authority of 15 U.S.C. § 78j. The operative facts relied on are those alleged in Count I of the Amended Complaint. Therefore, what was said above with respect to the alleged misrepresentations asserted in paragraph 23 of the Amended Complaint applies equally to the claim under Rule 10b–5. In addition, with respect to a 10b–5 claim, it is incumbent upon the complainant to demonstrate that the alleged misrepresentations were such as would have been relied on by a reasonable investor in the exercise of due care under the facts existing at the time of the representations. Clement A. Evans & Co. v. McAlpine, 434 F.2d 100 (5th Cir. 1970), cert. denied, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153. Given the speculative nature of the investment, as well as the nature of the alleged misrepresentations, the Court concludes that a reasonable investor, in the exercise of due care, would not have relied on the misrepresentations in making his decision to invest.

8. For the reasons stated in paragraphs 3–7 above, the Court concludes that the plaintiff has not sustained his burden of proof on the substantive allegations in Counts I, II and III, as against the defendants Florida Orange Grove Properties, Inc., Orange Groves of Florida, Inc., Orange Grove Investment Corp., and Florida Orange Groves Ltd.

9. While the conclusion reached in paragraph 8 might render moot the claims of liability on the part of Alfred D. Van, Sam and Eva Lewis, Murray Schwartz, Citizens National Bank, and Aline A. Gay and Gerald A. Gay as personal representatives of the Estate of C. M. Gay, and Security Mortgage & Investment Company, the Court will enter its conclusions on those claims for the purpose of completing the record against the possibility of appellate review.

 The Securities Act of 1933 and the Securities Exchange Act of 1934, in similar provisions, impose liability on persons who control others upon whom a liability has been imposed under the Acts, 15 U.S.C. §§ 77o, 78t. For purposes of attaching liability under either provision in a manner consistent with due process, the person sought to be held liable for the conduct of another must be shown to have had the lawful authority to control or influence that conduct in such a way as to have been able to avoid liability. Strong v. France, 474 F.2d 747 (9th Cir. 1973).

 (a) In the present case, the facts indicate that C. M. Gay, by reason of his influence over Citizens National Bank, had a measure of control over the ability of the Selling Corporations to borrow money from Citizens National Bank. To conclude from this, however, that C. M. Gay had the ability, in fact or in law, to control the activities of the Selling Corporations in relation to the latter's own customers is an unwarranted interpretation of the facts. The evidence does not support that conclusion. (See Findings of Fact, paragraphs 39–45, 47 and 48, supra.) For this reason, neither C. M. Gay nor Citizens National Bank should be considered as "controlling persons" under 15 U.S.C. § 77o or § 78t; cf. Ayers v. Wolfinbarger, 491 F.2d 8 (5th Cir. 1974).

(b) The defendants Alfred D. Van, Sam J. Lewis and Murray Schwartz had the ability and the right to control the liability producing activities of the Selling Corporations and, therefore, as to such corporations they should be considered as controlling persons.

 10. By somewhat conclusory allegations in paragraphs 57 and 59 of

the Amendment to the Amended Complaint, the plaintiff has advanced the theory that defendants Citizens National Bank and Security Mortgage & Investment Company are primarily liable as sellers of the securities involved. The evidencé indicates that Citizens National Bank and Security Mortgage & Investment Company were related to the Selling Corporations only as lenders. There is no evidence that either made loans to the plaintiff or any member of the class to enable him to complete a lot purchase. (See Findings of Fact, paragraphs 38, 45–47, supra.) Under these facts, the relationship between the lenders and the lot buyers is too remote to establish the lenders as sellers of securities for purposes of 15 U.S.C. § 77*l* or § 78j, or Rule 10b–5. Compare Hill York Corp. v. American International Franchises, Inc., 448 F.2d 680 (5th Cir. 1971).

11. For the reasons set forth above, the Court concludes that the plaintiff has not met his burden of proof with respect to Counts I, II and III of the Amended Complaint as amended by the Amendment thereto filed 12 March 1973.

12. Chapter 478, Florida Statutes 1967, F.S.A., (Ch. 67–229, Laws of Florida 1967) became effective on 1 August 1967. Its statutory predecessor, Ch. 63–129, Laws of Florida 1963, provides no benefit to the plaintiff and the class members who bought during the time it was in effect, because Ch. 63–129 applied only to land sales effected by means of "an installment land sales contract" which the statute defined as follows:

". . .

(2) Installment land sales contract means any money, receipt, certificate, contract or any instrument in writing evidencing an arrangement or agreement whereby the purchase price for real property or any interest therein is amortized by periodic payments and the conveyance with recordation in public records of legal title to the purchaser thereof is deferred. . ."

In the present case, the evidence indicates that no sales were effected by installment land sales contracts, but by a normal contract for purchase and sale which did not contemplate deferred passage of legal title. Section 478.231, Florida Statutes 1967, prohibits the offer or disposition of any interest in subdivided land in this State, unless the lands are registered in accordance with the terms of the Act. Section 478.191, Florida Statutes 1967, F.S.A., provides a civil remedy against any subdivider who disposes of subdivided lands in violation of the registration provisions of the Act. Section 478.191 also provides that any person who materially participates in and contróls any such disposition is jointly liable with the subdivider, unless such person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts which gave rise to the liability.

It appears from the evidence that Sunrise, Sunset and Sunshine Groves are subdivisions within the contemplation of Ch. 478, Florida Statutes 1967, F.S.A. See specifically § 478.021(2)(b). It further appears that the Selling Corporations and Florida Orange Groves Ltd. were "subdividers" within the contemplation of Ch. 478, Florida Statutes 1967, F.S.A.

Since none of the three groves from which sales were made to the plaintiff and the class members were registered under Ch. 478, Florida Statutes 1967, F.S.A., the Selling Corporations and Florida Orange Groves Ltd. are liable under the provisions of § 478.191 to the plaintiff and any member of the class to whom they sold unregistered land after Chapter 478 became effective, subject to any applicable statute of limitation which could stand in bar of an individual class member's claim.

For the reason mentioned in paragraph 9 above, the Court concludes that the following were controlling persons under the provisions of § 478.191(3), Florida Statutes 1967, F.S.A.:

(A) As to Orange Groves of Florida, Inc., Florida Orange Grove In-

vestment Corp., and Florida Orange Grove Properties, Inc.: Alfred D. Van, Murray Schwartz, and Sam Lewis.

(B) As to Florida Orange Groves Ltd.: none shown by the evidence.

For the reasons mentioned in paragraph 9(a) above, the Court concludes that Citizens National Bank, C. M. Gay, and Security Mortgage & Investment Company were not controlling persons for purposes of § 478.191(3), Florida Statutes 1967, F.S.A., as to any subdivider.

 While the Court recognizes that it could decline to adjudicate the claims asserted under Count IV of the Amended Complaint because the federal claims have failed, the Court concludes that at this stage of the proceeding judicial economy, convenience, and fairness to the litigants justify the retention of jurisdiction over the pendent claim for the purpose of final adjudication. United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

13. Count V of the Amended Complaint asserts a pendent claim for common law fraud. This claim, like those asserted in Counts I, II and III, is based on the misrepresentations alleged in paragraph 23 of the Amended Complaint. What is said in paragraphs 5–8, supra, with respect to the failure of proof under Counts I and III applies equally to Count V. The Court concludes, therefore, that the plaintiff has not sustained his burden of proof under Count V of the Amended Complaint, as amended.

14. Based on the foregoing Conclusions of Law an order will be entered by the Court pursuant to Rule 23, Fed.R. Civ.P.: (a) providing for intervention by individual members of the class within a limited period of time and for the assertion and adjudication of their legal and equitable claims for relief under Count IV of the Amended Complaint against such of the defendants as have been herein found potentially liable under Ch. 478, Florida Statutes 1967, F.S.A.; (b) providing for the assertion of the de-

fense of the statute of limitations by any such defendant, and (c) providing for notice to the members of the class. In accordance with Rule 54(b), Fed.R.Civ. P., final judgment will not be entered until the final adjudication of all claims which may be asserted by intervenors.