John A. PHILLIPS, Herbert Craig, Jr.,
E. E. Taylor, Herbert Craig,
A. Felleman Fish

v.

REYNOLDS & CO.,

and

Lawrence S. Warren.

Civ. A. No. 35663.

United States District Court
E. D. Pennsylvania.

Jan. 14, 1969.

——————◆——————

David Kanner, Kanner, Stein, Feinberg & Barol, Philadelphia, Pa., for plaintiffs.

Eliot H. Lumbard and Daniel E. Kirsch, Townsend & Lewis, New York City, for Reynolds & Co.

George P. Williams, III, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendant Lawrence S. Warren.

## FINDINGS OF FACT, DISCUSSION, and CONCLUSIONS OF LAW

WOOD, District Judge.

Plaintiffs in this action sought to recover damages for common law fraud and for violations of Section 17 of the Securities Act of 1933 and Section 10 of the Securities Exchange Act of 1934 in the purchase or sale securities. We find in favor of the defendants on all counts, and make the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Lawrence S. Warren, the individual defendant in this case, is a registered representative with Reynolds & Co., also a defendant. (N.T. 36)

2. Reynolds & Co. is a partnership of stockbrokers being members of the New York Stock Exchange and the American Stock Exchange; they are authorized to deal in over-the-counter securities. (N.T. 29)

3. At the time of the transactions concerned in this case, Mr. Warren was a duly authorized agent of Reynolds & Co. (N.T. 27)

4. Mr. Warren first became aware of Strategic Materials Corporation, the stock later purchased by plaintiffs through him, when he read an article about the corporation in the April 7, 1961 issue of TIME Magazine. (N.T. 258–9)

5. The TIME article, entitled "New Era for Steel?" reported that Strategic had initiated the "first commercial operation of a new era for the steel industry." This process was designed, it was stated, to make possible the production of steel from low-grade ores, which had previously not been commercially feasible for use in the open hearth method of steel manufacture. The article explained that this process had been developed by a metallurgist named Marvin J. Udy, and that a Mr. John C. Udd had formed Strategic Materials Corporation to exploit Udy's process.

The article further explained that "when all the bugs are worked out" the output of the first commercial plant employing this process to produce ferrochrome[1], would be purchased by Universal Cyclops Steel Corp. The article then reviewed a number of other pending projects for the use of the new process in the United States and various foreign countries. It stated that other metals such as chrome, copper, zinc, and manganese could be produced by use of this process. It was stated that further development of the process "could lead to the quick building of a steel industry in underdeveloped countries," and cited several pilot projects of this nature.

---

1. An ingredient of stainless steel.

The article concluded that "thus far, more than $12 million has been poured into Strategic Materials without a cent of profit, but by the end of this year Chambers [Strategic's President] hopes to start breaking even and by next year to show some earnings." (P. 94, Ex. D–W–1)

6. The consolidated income statement for Strategic Materials Corporation and its subsidiaries for the year ended December 31, 1960 showed the following:

| | |
|---|---|
| Net loss for the year | $1,214,065 |
| Deficit at beginning of year | 7,825,281 |
| Deficit at end of year | $9,039,346 |

(Ex. P–1, p. 10; see also, Ex. P–2

7. Upon reading the TIME article, Mr. Warren sought to investigate the prospects of investing in Strategic. He learned that another Philadelphia investment firm was interested in Strategic and actively selling its stock to customers; that a large New York investment firm had invested substantial amounts in Strategic; that the Donner Foundation was investing heavily in Strategic; and that several other large concerns were either interested in Strategic or already investing in it. (N.T. 52–4, 63–5, 299–302, 310–11, 265–7, 293)

8. Subsequently, Mr. Warren met with Mr. Udd and Mr. Chambers, the Chairman of the Board and President of Strategic and discussed the prospects of Strategic with them. He was impressed with the management and directors of Strategic. (N.T. 52–4, 267–9)

9. Mr. Warren became convinced that the prospects of Strategic were bright. On April 14, 1961, before selling Strategic stock to any of his customers, he purchased 4,000 shares of it at the price of 26⅜; he purchased more on April 17, 1961 at the same price; and he purchased additional shares in May, June, August, and October of 1961. In all, Warren bought 9,000 shares of Strategic stock at a cost of about $229,-000. Warren had a large profit on another stock in 1962 and, to provide an off-setting loss for tax purposes, he sold the Strategic stock at a loss to himself and his wife of $173,598,00. (N.T. 228–234, 272)

10. After purchasing the initial batch of shares in Strategic, Warren recommended the stock to large numbers of his customers and sold more than 20,000 shares of it to approximately 80 different buyers. (N.T. 67–8)

11. The claims of plaintiffs John A. Phillips and Herbert Craig, Sr. have been dismissed by the court by agreement of counsel. (N.T. 241, 316)

12. In April, 1961, plaintiff A. Felleman Fish was sixty-one years old, a graduate of Wharton School of the University of Pennsylvania, and a chartered life underwriter who had his own general insurance brokerage business. (N.T. 111, 171, 178)

13. Mr. Fish and Mr. Warren had first met each other at a golf club of which they were members. Several years later, in 1954, Mr. Fish began employing Mr. Warren as his broker. From that time until 1961, he used Mr. Warren as his broker exclusively. (N.T. 109–11, 126)

14. On Mr. Warren's advice, between 1954 and 1961, Mr. Fish engaged in a series of speculative securities transactions, including arbitrage in bonds in a railroad organization, and the purchase of stock in several speculative growth companies. Mr. Fish made considerable profits on these stock acquisitions which Mr. Warren had recommended, and as a result by April, 1961, he had implicit confidence in Mr. Warren's investment judgment. (N.T. 110, 126, 130–2, 136–8, 139–141)

15. On April 28, 1961, Mr. Warren called Mr. Fish on the telephone to suggest that he invest in Strategic Materials Corporation. Mr. Fish had not heard of Strategic Materials. (N.T. 141) During that conversation, Mr. Warren told Mr. Fish, among other things, that the Udy process would make it possible to utilize low-grade ore and low-grade coal in the manufacture of steel, particularly in

isolated parts of the world (N.T. 124), that the Donner Foundation and the Koppers Company had a substantial interest in Strategic (N.T. 162–3), that Strategic had a "Blue-Ribbon" board of directors (N.T. 162–3), that the entire output of ferrochrome of the first plant at Niagara Falls would be purchased by Cyclops Steel Company (N.T. 157), that Strategic did not pay a dividend (N.T. 159), and that he (Warren) was of the opinion that the Strategic stock had great prospects for capital appreciation. (N.T. 143, 160)

16. Mr. Fish did not seek or know much concerning Strategic operations other than what Mr. Warren told him, and having confidence in Mr. Warren's advice, (N.T. 125 et seq., 141–2), purchased 2,000 shares of Strategic Materials Corporation stock on April 28, 1961, at 29¾ for a total of $59,500. (N.T. 35) Mr. Fish did not discuss the stock with anyone other than Mr. Warren before purchasing it. (N.T. 142)

17. In order to purchase the shares of Strategic stock, Mr. Fish sold approximately $65,000 worth of Pennsylvania Turnpike Bonds. On the advice of Mr. Warren, Mr. Fish from time to time had purchased turnpike and other municipal bonds to hold capital in abeyance while temporarily out of the market. (N.T. 111, 138)

18. In August of 1961, the Strategic stock had dropped to the lower twenties. When Mr. Fish expressed concern to Mr. Warren, Mr. Warren remained optimistic about Strategic and advised Mr. Fish to purchase more Strategic stock in order to lower the average cost of his holding in Strategic. (N.T. 120)

19. For reasons not developed in this litigation, Strategic stock continued to fall in price. Consequently, Mr. Fish sold 500 shares of Strategic on August 3, 1964, and received a net amount of $3,438.60. On July 30, 1964, he sold another 500 shares at 5⅝ and received $2,748.23. At the time of trial, Mr. Fish retained 1,000 shares of Strategic. (N.T. 124)

20. Plaintiff Herbert Craig, Jr. was about 38 years old in April 1961, and was manager of an insurance company. He had studied for two years at the evening school of the Wharton School of the University of Pennsylvania. (N.T. 187, 203–4)

21. Mr. Craig had used Mr. Warren as his broker for several years prior to April 1961. He had profited on securities purchased on the advice of Mr. Warren, and by 1961, had considerable confidence in Mr. Warren's investment judgment. (N.T. 187–8, 192–3)

22. Mr. Craig first heard about Strategic stock on April 25, 1961, when he stopped into Mr. Warren's office. (N.T. 188) Mr. Warren described the stock generally as he did to Mr. Fish, stating among other things that the Udy process had great potential because it could produce metals from low-grade ores, that the ferrochrome output of the first plant had been sold, and predicted that the Strategic would hit 100 within about a year. (N.T. 188)

23. Mr. Craig noticed a copy of the TIME article concerning Strategic on Mr. Warren's desk and "scanned through" it while Mr. Warren received a phone call. (N.T. 189)

24. Mr. Craig did not purchase any Strategic stock at this time. After leaving Mr. Warren's office he did not read anything further about Strategic, and did not discuss the stock with anyone but his father, who was also contemplating purchase of Strategic stock. (N.T. 196)

25. On April 28, 1961, Mr. Craig purchased 300 shares of Strategic stock at 28½ per share for a total of $8,437.50. On May 4, 1961, he purchased 200 shares of the same stock at 28⅞ for a total of $5,775.00. On December 28, 1961, he purchased 100 more shares at 15¾ for a total of $1,575.00. (N.T. 188, 190–1)

26. At the time of his purchase, Mr. Craig was primarily influenced by Mr. Warren's prediction that the price of Strategic stock was likely to rise, not

on any detailed facts concerning Strategic's sales volume, its annual operating figures or any other particulars of its business or financial circumstances. (N. T. 199–201)

27. As the Strategic stock price continued to fall, Mr. Warren continued to advise Mr. Craig to buy more to average his cost of Strategic holdings. (N.T. 191)

28. Of the 600 Strategic shares which he purchased, Mr. Craig sold 200 for about $400.00. At the time of trial he retained 400 shares. (N.T. 192)

29. Plaintiff E. E. Taylor had not dealt with Mr. Warren as a broker prior to April 1961, but they were friends as a result of mutual membership in a golf club. (N.T. 205)

30. In April 1961, Mr. Taylor was Vice-President of E. Brook Matlack, Inc., a trucking company, and he had spent two years at Marquette University studying business administration. He had taken additional courses at Purdue and Michigan State. (N.T. 222, 224)

31. Sometime late in April 1961, Mr. Warren and Mr. Taylor first discussed generally the Strategic stock. (N.T. 211) Mr. Warren told Mr. Taylor that he would send him a copy of the TIME article. Mr. Taylor received and read the letter a few days later, including statements to the effect that $12 million had been poured into the company without a profit and that the management was predicting that the company would be breaking even by the end of 1961 and would be operating profitably in 1962. (N.T. 218)

32. Mr. Taylor called Mr. Warren on the telephone and discussed the TIME article and Strategic generally before Mr. Taylor purchased any Strategic stock. (N.T. 218)

33. Mr. Taylor purchased 100 shares of Strategic on April 25, 1961 at 28⅛ per share for a total of $2,812.50. On June 5, 1961, he purchased 400 shares at 26⅞ for a total of $10,750.00. (N.T. 33) He purchased 100 more shares of Stra-

tegic at 20⅝ for a total of $2,062.50 on September 18, 1961.

34. When he purchased the Strategic stock, Mr. Taylor had little specific information about the company except that contained in the TIME article. He knew that the Strategic process was in an experimental stage and he had no detailed knowledge about the company's sales volume, profit levels, or assets. (N.T. 212, 215–6, 220)

35. As Strategic's price went down, Mr. Warren continued to be confident about it and urged Mr. Taylor to purchase more to average his cost. (N.T. 208)

36. Mr. Taylor sold all of his Strategic stock in 1967 for approximately 56 cents a share. (N.T. 210)

## DISCUSSION

The major failure of disclosure complained of by the plaintiffs is that Warren did not apprise them at the time they purchased their stock that Strategic was running a deficit of approximately $9,000,000. The testimony before us was directly contradictory on this point. Plaintiffs steadfastly maintained that Warren either stated to them that Strategic was operating profitably in April 1961, or at least that he omitted to inform them that Strategic had a substantial deficit as of that date. Mr. Warren, on the other hand, earnestly recounted that either he did not tell them that Strategic was operating profitably, or he affirmatively stated that Strategic had a deficit of about $9,000,000 which would be valuable as a loss carryover for Federal tax purposes.

We do not think that Craig and Taylor can complain that they were not aware of Strategic's deficit, because both were given the TIME article by Warren before they purchased. As quoted in our findings of fact, that article stated in conclusion that:

"Thus far, more than $12 million has been poured into Strategic Materials without a cent of profit, but by

the end of this year Chambers [Strategic's President] hopes to start breaking even and by next year to show some earnings."

This passage does not, it is true, simply and directly aver that Strategic had a $9,000,000 deficit on its 1960 earnings statement. It is stated, however, that Strategic had not "broken even" or "shown any earnings", and that $12 million of capital had been poured into the operation without significant returns. It is certainly clear from this statement that Strategic was not operating "profitably" in April 1961. It may also be fairly implied from it that Strategic had a·substantial deficit, and if plaintiffs read it they could not help but be aware of the fact. Both Craig and Taylor were experienced business executives undoubtedly familiar with balance sheets, the problems of embarking upon new enterprises, and the tendency of management to be euphemistic about losses. They should have been aware that a significant deficit existed, and if they were concerned about the precise amount they could easily have found out before purchasing.

Taylor read the article and discussed it on the phone with Warren before purchasing. Craig perused the article in Warren's office while Warren received a telephone call. If, as he stated to us, he did not read the concluding paragraph carefully, he certainly had the opportunity to do so. Had the document given them by Warren been long and detailed, and the deficit disclosed in small print or in an obscure place, plaintiffs might not be charged with knowledge. The TIME article, however, was a concise summary which could be digested in a few short minutes. Once having been given this article, the neglect to make Craig aware of the deficit was Craig's, not Warren's.

■ Taylor and Craig have contended that, in spite of·what has already been stated, although they may have had access to the TIME article, Warren explicitly assured them that Strategic was operating profitably at the time they purchased their stock. We find it difficult to believe that Warren would hand his customers an article stating that Strategic had a significant deficit and at the same time state that Strategic was currently operating at a profit. In any event, they had access to a more authoritative source than Warren, and could have resolved any inconsistency by asking for a financial statement. In short, we do not think that plaintiffs Taylor and Craig have carried their burden, and for the above reasons, as well as for reasons to be considered at a later point, we conclude that Warren is not liable for common law fraud or violations of the aforementioned Federal Securities laws with respect to either of them.

■ There is no evidence that plaintiff A. Felleman Fish received a copy of the TIME article, and therefore his case requires separate consideration. As with plaintiffs Taylor and Craig, we do not think that Fish has carried his burden to convince us that Warren affirmatively represented to him that Strategic was operating profitably as of April 1961. It was understandably difficult for Warren to recall what he had told each of the 80 customers who purchased Strategic stock through him. Fish's testimony on this point was equivocal;[2] at times he seemed to say that he could not recall whether Warren said that the overall combined operations of Strategic were profitable[3] (as opposed to the ferrochrome plant), and at other times he resolutely maintained that Warren told him that Strategic was profitable. Fish admitted that he was aware that Strategic did not pay a dividend,[4] a fact which suggests that it was not making substantial profits. Moreover, assuming that Warren was a salesman desiring to persuade his customer by putting Strategic in as strong a light as possible, he could

2. See, for instance, N.T. 156–9.

3. N.T. 157.

4. N.T. 159.

well have argued that accumulated losses were a positive aspect of a young venturesome company like Strategic because they could be offset against future profits in computing taxes. Fish had engaged Warren's advice in the past and reaped handsome profits on similar speculative ventures, and on this occasion most of the discussion between the two men undoubtedly focused upon the potential for Strategic, the Udy process, and the possibilities for capital appreciation. Warren may well have spoken loosely about predictions of future profits, and in a retrospect embittered by a turn in fortune, Warren's predictions seemed like assurances of general profitability.

If, as we hold, Warren did not affirmatively state that Strategic had a significant operating deficit in April 1961, there remains the assertion of the plaintiffs that Warren had an affirmative duty under Rule 10b–5 to make them aware of such a material fact concerning the security before they purchased it. For a number of reasons we do not think that the securities laws intended to impose liabliity in the circumstances of this case. Under Rule 10b–5, unless there is some special relationship between the parties imposing some duty to affirmatively disclose material facts concerning a security, liability should not be imposed. "The shrewd analyst is not forbidden to take advantage of the stranger who is less sophisticated." Noble, 59 Yale L.J. 1120, 1148; See also Vol. 11A, Business Organizations—Securities Regulation: Gadsby, The Federal Securities Exchange Act § 5.03[1] and cases there cited. Earlier cases required that the defendant be an "insider" in the generally accepted meaning of an officer, director or controlling stockholder. More recent cases have, however, stated that such a duty to disclose might be placed upon "anyone who, by virtue of his position is in possession of information the publication of which might affect the value of the company's securities." Gadsby, supra, § 5.03[1]. Here Warren was neither an insider at the time of the sales complained of, nor was he in possession of information which was not generally available to the plaintiffs had they sought it out. To make a broker liable under these circumstances would make him a virtual insurer of his investment recommendations unless he provided customers with every conceivable material fact concerning a stock before customers purchased.[5] Under other circumstances a broker might well be liable under Rule 10b–5;[6] but we think it is clear that he should not be so held here.

At trial and in its proposed findings of fact and conclusions of law plaintiffs asserted that Warren attempted to foist upon them a stock which he well knew was much too speculative for their investment situation. They also assert that Warren did not inform them that Strategic was a highly speculative stock. They did not explicitly invoke, although they may have intended to suggest, that the so-called "suitability doctrine" might be applicable to this case. Under this doctrine, on which we have found a dearth of cases and comment, it may be

---

5. We recognize that, in some instances, it may be very difficult to gather information concerning over-the-counter stocks upon which to base his investment decision. The broker-dealer who has accumulated information concerning a potential investment opportunity through channels especially accessible to broker-dealers may well have some duties to investors to disclose it.

See 71 Yale L.J. 736, 744. Here, however, we do not reach any such problems. The only major omission alleged is Strategic's deficit. Such financial statistics are regularly published in annual reports, and investors are generally aware of their existence and significance.

6. "The disciplinary proceedings brought against broker-dealers by the SEC under Rule 10b–5 and Rule 15c–2 are * * * legion and there is little room to doubt that a particular customer injured by a violation which would justify such proceedings is entitled to recover damages." Gadsby, supra, § 5.03[2] See also Stockwell v. Reynolds & Co., 252 F.Supp. 215 (D.C.1965); Glickman v. Schweickart & Co., 242 F.Supp. 670 (D.C.1965); Phillip J. H. Lederer Co., CCH Fed.Sec.L. Rep. ¶ 91.039 (SDNY 1961).

fraudulent or a breach of an implied warranty of fitness for a broker or investment advisor to suggest investments to customers which are obviously not apposite to their investment situation. See Mundheim, Professional Responsibility of Broker-Dealers: The Suitability Doctrine, Duke L.J. (No. 3) 445 (1965); 39 Temple L.Q. 493, 495–8. Any such theory is clearly inapplicable to Mr. Fish because he was aware of the level of risk at which he was investing, and had engaged in speculative transactions for several years prior to the transactions here complained of. Moreover, the plaintiffs' assertion that Mr. Warren failed to disclose that Strategic was a highly speculative stock is difficult to reconcile with their testimony that he predicted to them that Strategic would go from 30 to 150 in one year.

We do not think that the plaintiffs have alleged any other material misstatements. All three complained generally that Warren was highly optimistic concerning future prospects and profits, and suggested rapid capital appreciation. They recognized, however, that he was only giving them an opinion, and such "puffing", unless grossly exaggerated is not grounds for civil liability under Rule 10h–5. See Loss, Securities Regulation, Vol. III (1961 ed.) p. 1438.

■ Aside from the foregoing grounds we cannot find the defendants liable because we do not think that Fish (or the other plaintiffs) relied on an assumption of current profitability in purchasing Strategic stock. As the testimony and our findings of fact demonstrate, Fish and the others knew few specific facts concerning the financial condition or operations of Strategic, and did not seek such information. All were interested in Strategic as a promising speculative venture which might in time yield great capital appreciation; all realized that the Udy process was a new and experimental one, and that the output of only one commercial operation had been sold. At such an inchoate stage it is normally necessary to plough significant amounts of capital into research and operations before income statements show profits. The company was a new one and could not be expected to have an established capital backing. Fish and Craig had previously profited from speculation on Warren's advice. All three plaintiffs were primarily attracted by Warren's statement of investment judgment, in which they had great confidence. They would not have been surprised to hear that Strategic had a deficit (which, in any event held tax advantages for a young and growing enterprise). Plaintiffs have failed to prove the reliance necessary to recover for fraud under Federal securities laws or the common law of Pennsylvania. List v. Fashion Park, Inc., 340 F.2d 457 (2nd Cir. 1965); Kohler v. Kohler Co., 208 F.Supp. 808 (E.D.Wis.1962), affirmed 319 F.2d 634, 7 A.L.R.3d 486 (7th Cir. 1963); Emery v. Third National Bank of Pittsburgh, 314 Pa. 544, 171 A. 881 (1934).

■ Finally, plaintiffs made assertions to us during trial and in their requests for findings of fact and conclusions of law that Warren acted as a principal rather than an agent or broker on some transactions without disclosing it to them, and that he charged more for the Strategic shares than he paid for himself. If properly raised and proved, these assertions might raise substantial questions. See Loss, Securities Regulation, supra, Vol. III, Ch. 9D, Section 3 (a), and Charles Hughes & Co. v. SEC, 139 F.2d 434 (2nd Cir. 1943), cert. den. 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1943). The testimony of Warren was that in those cases where he acted as principal, he told plaintiffs that he acted as such. We have not found, nor has the plaintiff cited to us, any testimony to the contrary. Nor is there any evidence showing on which stock Warren acted as principal and on which he acted as a broker-agent. Similarly, there is insufficient evidence to show that plaintiffs paid more than the market price less allowable commissions.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this case.

2. By agreement of all counsel and by order of Court, the actions brought by Mr. Craig, Sr. and Mr. Phillips are dismissed.

3. Warren was guilty of no common law fraud in the course of the transactions in which he sold Strategic stock to Messrs. Fish, Craig and Taylor.

4. Warren is not liable to any of the plaintiffs under the Securities Exchange Act of 1934, or under Rule 10b–5 issued thereunder.

5. Having concluded that Warren committed no fraud either at common law or under the statute, it follows that his principal, Reynolds & Co., in any of the transactions, is not liable.