**FRANKLIN SAVINGS BANK OF NEW YORK, Plaintiff-Appellee,**

v.

**Gustave L. LEVY et al., Defendants-Appellants.**

**No. 292, Docket 76–7178.**

United States Court of Appeals, Second Circuit.

Argued Dec. 15, 1976.

Decided March 9, 1977.

Robert S. Stitt, New York City (Thacher, Proffitt & Wood, New York City, George W. Taliaferro, Jr., Raymond L. Vandenberg, New York City, of counsel), for plaintiff-appellee.

Michael M. Maney, New York City (Sullivan & Cromwell, New York City, William Piel, Jr., Philip L. Graham, Jr., Charles E. Dorkey III, New York City, of counsel), for defendants-appellants.

Before MULLIGAN, VAN GRAAFEILAND and MESKILL, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Southern District of New York entered on January 13, 1976 following a nine-day bench trial before the Hon. Charles M. Metzner, District Judge. Defendants-appellants, Goldman, Sachs & Co. and its general partners (Goldman, Sachs), were found to have violated § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), and § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the Securities Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5.

The violations were based on a sale by Goldman, Sachs to plaintiff-appellee Franklin Savings Bank of New York (Franklin) of a Penn Central Transportation Company (Penn Central)[1] note. A judgment of $500,000 with interest and costs, was entered in favor of Franklin.[2] The district court opinion is reported at 406 F.Supp. 40.

Goldman, Sachs is a leading commercial paper dealer and was the exclusive dealer for Penn Central's notes. Dealers act as principals, buying from the issuer at one interest rate and selling to investors at a slightly lower rate. This "spread" constitutes the dealer's compensation. The commercial paper, dealt in by Goldman, Sachs consisted of short-term, unsecured promissory notes of industrial or finance corporations. Since the interest rates on the paper are only fractionally different from rates available on other money market instruments such as Treasury bills, the differential only becomes significant in investments of ninety days or less when large sums are involved. In 1969 and 1970 the average commercial paper transaction involved notes having a total face amount in excess of one million dollars.[3] It was a Goldman, Sachs' policy not to make sales under $100,-000. This was neither a market nor an investment vehicle in which widows and orphans sought refuge.

New York State enacted a statute, N.Y. Banking Law § 235.12–a (McKinney 1971), effective June 1, 1968, which allowed savings banks to invest in commercial paper. Such banks were only permitted to purchase paper which an independent rating

---

1. Penn Central Transportation Company, the issuer of the paper, is a wholly owned subsidiary of Penn Central, a publicly held holding company. There is no need to distinguish them here and the two entities will be referred to hereafter as Penn Central.

2. The complaint also pleaded violations of § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), the New York Martin Act, N.Y. General Business Law § 352–c, and the common law. Judge Metzner did not reach the merits of the § 17(a) claim. Neither do we.

3. Comment, The Commercial Paper Market and the Securities Acts, 39 U. of Chi.L.Rev. 362, 364, 368 (1972) [Chicago Comment]. As another recent commentator has indicated, the 1960's was a decade of significant change in the commercial paper market. "The changes . . . included a tenfold increase in outstanding commercial paper, the emergence of banks and bank holding companies as issuers of commercial paper, the recovery of dealer-placed paper from one-fifth to one-third of total outstandings, and the replacement of commercial banks by nonfinancial corporations as the primary purchasers of both dealer and directly placed paper." Schweitzer, Commercial Paper and the Securities Act of 1933: A Role for Registration, 63 Geo.L.J. 1245, 1250 (1975).

service designated by the State Banking Board had given its highest rating. The National Credit Office (NCO), a subsidiary of Dun & Bradstreet, an approved service, had rated the Penn Central paper "prime", its highest rating on August 1, 1968.

Soon after the passage of this law, Goldman, Sachs advised Franklin in writing of the services which the investment bank offered in the commercial paper field. The parties transacted business several times before March 16, 1970 when Franklin purchased from Goldman, Sachs a Penn Central note with a face value of $500,000 and a maturity date of June 26, 1970. The price paid by Franklin was $487,958.33. On June 21, 1970 Penn Central filed its reorganization petition in bankruptcy with the United States District Court for the Eastern District of Pennsylvania and is still in reorganization. Franklin tendered the note and payment was never received.

Penn Central was formed on February 1, 1968 by the merger of the New York Central and Pennsylvania Railroads. It was the nation's largest railroad and sixth largest nonfinancial corporation. By the time the bankruptcy occurred, there was outstanding $82,530,000 of commercial paper which Penn Central had been unable to either refinance or roll over and which was not supported by bank credit lines. Goldman, Sachs, the nation's largest commercial paper dealer, had sold all of this paper to approximately 60 lenders.[4]

On February 4, 1970 Penn Central's financial statements for both the year 1969 and its last quarter were publicly announced. The loss for the year was $56.3 million, ten times greater than that of the previous year. In the fourth quarter, the company had lost $13.2 million. Disturbed by this news, Goldman, Sachs arranged a meeting with representatives of Penn Central for February 6. The day before the scheduled conference, Robert Wilson, a Goldman, Sachs general partner and a named defendant, called Jonathan O'Herron, a Penn Central vice president, attempting to convince Penn Central to buy back some of the approximately $15 million of Penn Central paper that the investment bank had in its inventory.

Wilson and the late Gustave Levy, another Goldman, Sachs general partner and a defendant, attended the February 6 meeting on behalf of the dealer. Penn Central was represented by O'Herron and David Bevan, chairman of that company's finance committee. Penn Central reported that its projected losses for 1970 would be no greater than its 1969 losses. Goldman, Sachs told O'Herron and Bevan that it would place a $5 million limit on the amount of Penn Central paper it would carry in its inventory. It also urged Penn Central to get 100% bank line coverage of its outstanding commercial paper; at that time, the bank line coverage was only 50%.[5] On February 9, Penn Central bought back $10 million worth of paper from Goldman, Sachs.

Brown Brothers Harriman & Co., an investment banking firm which had purchased as much as 15% of Penn Central's commercial paper on February 5, 1970 removed that company from its approved list.

In finding Goldman, Sachs violated § 10(b) of the 1934 Act and § 12(2) of the 1933 Act, the district court found that both the buy back of February 9 and the removal of Penn Central from the Brown Brothers approved list were material facts which affected the quality and credit worthiness of the note. The failure of Goldman, Sachs to disclose these facts was found to create liability under both acts.

## I. *1933 Act*

### A. Jurisdiction

■ For jurisdiction under § 12(2) of the 1933 Act, 15 U.S.C. § 77l(2), the statute

---

4. Chicago Comment, *supra* note 3, at 376–77.

5. Bank credit lines are "open credit lines [that] range from informal understandings between the bank and the issuer to formal revolving credit agreements between the two parties. The line of credit is generally extended by a bank on the condition that there will be no material adverse change in the financial condition of the potential borrower." Chicago Comment, *supra* note 3, at 372.

requires that the security be sold "by the use of any means or instruments of transportation or communication in interstate commerce or of the mails." It can not be disputed that the Penn Central note is a security within § 12(2).[6] As the court found below, the sales here consisted primarily of the manual delivery of the note and the receipt of payment, neither of which occasioned the use of the mails. After the delivery of the note and the receipt of payment however, Goldman, Sachs mailed a letter to Franklin on March 16, 1970 confirming the sale. The confirmation slip contained the discount date, the name of the purchaser, the full amount of the note, the discount rate and amount, the maturity date of the note, the net discounted price and delivery instructions. The note itself only revealed its face value and maturity date. On the same day Franklin mailed a letter to the Savings Bank Trust Company, its agent bank, authorizing and directing it to receive the note from Goldman, Sachs and to charge Franklin's account in the sum of $487,958.33. Again on March 16 the Savings Bank Trust Company mailed a letter to Franklin confirming that the note had been received by its depository, Chemical Bank New York Trust Company, and to complete the paperwork the latter bank mailed a letter to Franklin confirming that its account had been debited in the amount of $487,958.33. The district court found jurisdiction on the basis of either the first or fourth of the mailings described. While all of these mailings were instructional or confirmatory and the actual

delivery of the note and payment were achieved manually and without the use of the mails, we find that they were within the statutory language and were sufficient to provide jurisdiction.[7] The record establishes that while manual delivery may be usual in transactions of this nature in New York City, written confirmations are important not only for internal record keeping purposes of the banking institutions involved but for their regulatory agencies as well.

Appellants claim that § 12(2) literally provides for jurisdiction only if the cause of action arises in this case against one who offers or sells a security by the use of the mails. However, in *United States v. Cashin*, 281 F.2d 669, 673–74 (2d Cir. 1960) in discussing the applicability of §§ 17 and 24 of the 1933 Act, we stated:

> The use of the mails need not be central to the fraudulent scheme and may be entirely incidental to it. Indeed, in the very case before us the only alleged use of the mails was to confirm purchases already induced by the defendants' deceit. No claim is made that fraudulent matter was mailed or even that the mailings alleged were necessary to the execution of the unlawful scheme.

(Citations omitted.) Appellants point out and we recognize that *Cashin* involved venue and that the jurisdictional comment which we have cited constitutes dicta. However, it has been generally held that the mailing of a letter which simply confirms a prior sale constitutes an appropriate basis for jurisdiction under the 1933 Act.[8]

---

**6.** Although notes with a maturation period of less than nine months and securities issued by a common carrier are exempted securities under §§ 3(a)(3), (6) of the 1933 Act, 15 U.S.C. §§ 77c(a)(3), (6), they are despite this exemption explicitly included within the coverage of § 12(2), 15 U.S.C. § 77*l*(2).

**7.** In light of this determination it is unnecessary to address appellee's additional contention that an intrastate telephone call is a sufficient basis for 1933 Act jurisdiction.

**8.** *United States v. Porter*, 441 F.2d 1204, 1211 (8th Cir. 1971); *Moses v. Michael*, 292 F.2d 614, 618 (5th Cir. 1961); *Creswell-Keith, Inc. v. Willingham*, 264 F.2d 76, 78–80 (8th Cir. 1959);

*Schillner v. H. Vaughan Clarke & Co.*, 134 F.2d 875, 877 (2d Cir. 1943); *United States v. Benigno*, [Current Binder] CCH Fed.Sec.L.Rep. ¶ 95,-812 (S.D.N.Y. Oct. 6, 1976); *Welch Foods Inc. v. Goldman, Sachs & Co.*, 398 F.Supp. 1393, 1396 (S.D.N.Y.1974); A. Jacobs, The Impact of Rule 10b–5 at § 3.01[c] ("The better rule . . . is that the jurisdictional means [specified in § 12(2)] (such as the mails) need only be involved at some stage of the transaction and do not have to transmit the misleading prospectus or oral communication.")

The only contrary authority cited by appellants is 3 L. Loss, Securities Regulation 1525 (1961), "Of course, since the mails or interstate facilities must be used in some manner *for the*

Appellants also urge that there is no support in the record for Judge Metzner's conclusion that the mailing by Savings Bank Trust Company was foreseeable by Goldman, Sachs. However, one of the mailings relied upon by the district court was the mailing by Goldman, Sachs itself of the confirmation slip to Franklin. This would negate as well appellants' contention that communications among the banks and the dealer were normally by messenger and not by mail. We conclude that there was sufficient use of the mails here to find jurisdiction under § 12(2) of the 1933 Act.

## B. Merits

Section 12(2) imposes liability upon:

Any person who—

(2) offers to sell or sells a security . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission

. . . .

In finding that there was a violation of § 12(2) the district court's opinion made only this reference:

In view of the understanding between the parties as to the basis upon which the notes were being sold, which amounts to a statement of a material fact, Goldman, Sachs is also liable under Section 12(2).

406 F.Supp. at 47. In the preceding paragraph of its opinion in finding § 10(b) liability under the 1934 Act, the court referred to Goldman, Sachs' failure to disclose certain material facts. Thus it appears that Judge Metzner's basis for finding § 12(2) liability was the failure to disclose the same facts upon which he based § 10(b) liability. Those omitted facts principally relied upon by the court below are as follows:

1) On February 6, 1970 Goldman, Sachs advised Penn Central that it would place a limit of $5 million on the paper of Penn Central which it would carry in its inventory. Penn Central paper had been running up to $20 million of the dealer's inventory. On February 9, Penn Central brought back $10 million of its paper reducing the amount of it in Goldman, Sachs' inventory to below $5 million. While recognizing that Goldman, Sachs had urged that there were valid business reasons for this policy Judge Metzner found that no other inventories were reduced by Goldman, Sachs. 406 F.Supp. at 45.

2) On February 5, 1970 Penn Central's commercial paper was removed from the approved list of Brown Brothers Harriman & Co. It had held as much as 15% of the Penn Central paper through purchases from Goldman, Sachs and it now ceased purchasing this paper. Id. at 46.[9]

---

*purpose of executing the fraud,* it does not suffice to show that they were used after the completion of the scheme." (Emphasis in the original.) However, this statement was derived from cases construing the mail fraud statutes and not the 1933 Act. This court has already commented on the problems involved in using the mail fraud statutes as a guide to reading the 1933 Act. "The analogy is not an apt one because it ignores the fundamental fact that the purpose of the mail fraud statutes is to protect against the 'use of the United States mails in furtherance of . . . [the] schemes,' . . . while the evil at which the Securities Act is directed is the fraud in the sale of securities." *United States v. Cashin, supra,* 281 F.2d at 674 (citations omitted).

While this rejection was directed at an analogy for venue purposes, it is also instructive on the issue of jurisdiction.

**9.** Goldman, Sachs had urged Penn Central to obtain 100% bank line credit coverage of its $200 million of outstanding commercial paper. Coverage was currently around 50%. The district court recognized that the increased coverage was desired by the dealer because it would increase the marketability of the paper. However, it viewed Goldman, Sachs having Penn Central buy back its inventory out of "its existing insufficient lines of credit" as undermining the dealer's claim that the buy back was solely for business purposes and not because it

Appellants urged that alleged evidentiary errors precluded Goldman, Sachs from establishing that these facts principally relied on by Judge Metzner were not material. With respect to Goldman, Sachs' reduction of its Penn Central inventory, appellants claim that the finding that the dealer did not reduce other inventories was clearly erroneous since the uncontradicted testimony on trial was that there were other instances of return of inventory and that in their post-trial motion for a new trial an offer of proof of other evidence was available which would have detailed further inventory reductions and returns to other issuers. In essence, appellants urge that the Penn Central reductions of inventory did not evidence any lack of faith in that paper by Goldman, Sachs but rather that it was motivated by legitimate business considerations applicable to the paper of other issuers as well.

■ With respect to Brown Brothers Harriman's removal of Penn Central commercial paper from its approved list, appellants point out that on the trial, counsel for Franklin sought to elicit on cross-examination testimony that Goldman, Sachs did not disclose this fact to investors. The trial judge however refused to permit the question to be answered and indicated clearly that what Brown Brothers Harriman did made no difference and that he would not give it any weight. In its opinion below the court, however, stressed "If investors knew that Goldman, Sachs had arranged for buybacks by Penn Central of $10 million of its inventory and that Brown Brothers Harriman had stopped buying at all, there is no doubt in my mind that there would be no chance of ever selling this paper as roll over for maturing paper." 406 F.Supp. at 46. The court also had earlier said in its opinion, "It is the surrounding circumstances involved in the buy-back, and the removal of Penn Central commercial paper from Brown Brothers Harriman's approved list on February 5, which creates the problem in this case." Id. Appellants urge that the trial posture of the court is inconsistent

with its findings. Moreover, appellants argue that its materiality could have been weakened by evidence that Brown Brothers Harriman itself had an unsecured line of credit available to Penn Central and had in fact lent $2 million to Penn Central on April 30, 1970. On the cross-examination of Mr. Harry H. Bock, president of Franklin, the court refused to let him testify as to whether knowledge that Brown Brothers Harriman had lent money to Penn Central in April 1970 would have affected his judgment as to the significance of the removal of Penn Central notes from the approved list of that company. Goldman, Sachs also argues that it could have offered on the significance of approved lists generally evidence showing that removal from such lists did not necessarily relate to the credit worthiness of the securities. This was also the subject of an offer of proof in the post-trial motion. In view of the strong reliance by the court upon both the buy back and the position of Brown Brothers Harriman, it was error to preclude appellants from offering proof on these issues.

■ Appellants argue that they could not have violated § 12(2) of the 1933 Act on the findings made below. Their argument basically is that, as found below, the representation of Goldman, Sachs was that the notes were credit worthy and high quality and that this constitutes merely an opinion only actionable if that opinion was dishonestly or recklessly held. The only authority cited for this proposition is *Myzel v. Fields*, 386 F.2d 718, 734 n.8 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). However that case involved § 10(b) of the 1934 Act and not § 12(2) of the 1933 Act. Moreover, the footnote relied upon simply recites the charge of the trial court in that case. Appellants admit that § 12(2) imposes liability where there is a failure on the part of the seller to exercise reasonable care. *Hill York v. American International Franchises, Inc.*, 448 F.2d 680, 695 (5th Cir. 1971). At the same time it is now recognized that under *Ernst & Ernst v. Hochfelder*, 425

thought the paper was unsound. This was because paper unattractive with 50% coverage

would surely be even more so with only 40% coverage. See 406 F.Supp. at 45.

U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) an intent to defraud criterion is imposed by § 10(b) and Rule 10b–5. We do not understand therefore why the latter standard should be applied to § 12(2).

The distinction between liability for the misrepresentation of a fact and the mere expression of an opinion is appreciated if at times difficult to make.[10] We have been loath, however, to permit a broker-dealer to escape liability under § 10(b) of the 1934 Act by recourse to the fact-opinion dichotomy. We have held that where a broker-dealer makes a representation as to the quality of the security he sells, he impliedly represents that he has an adequate basis in fact for the opinion he renders. *Hanly v. Securities & Exchange Commission*, 415 F.2d 589, 596–97 (2d Cir. 1969). We see no reason why that theory is not at least equally appropriate in cases involving § 12(2) of the 1933 Act.

Here Goldman, Sachs became an exclusive source of the Penn Central notes in issue. It was a professional vendor admittedly recommending this paper for sale to an institution authorized by statute only to invest in prime paper. Such an undertaking implies that Goldman, Sachs had conducted an ongoing investigation of Penn Central's financial condition. If Goldman, Sachs failed to exercise reasonable professional care in assembling and evaluating the financial data, particularly in view of the worsening condition of Penn Central, then its representation that the paper was credit worthy and high quality was untrue in fact and misleading no matter how honestly but mistakenly held. This view does not render Goldman, Sachs an insurer as appellants claim—liable for some catastrophe beyond its control. Rather, it in fact makes the dealer responsible to Franklin if it is unable to shoulder the burden of establishing that it was not reasonable for it to have determined on March 16, 1970 that the quality of the paper it was purveying was

less than that represented. In our view this constitutes a proper construction of § 12(2). On remand the district court will address itself to that issue and conduct such further evidentiary hearings, if any, as in its discretion it may determine to be necessary.

## II. *1934 Act*

### A. Jurisdiction

With respect to § 10(b) of the 1934 Act appellants have raised serious jurisdictional questions. Before determining whether there is a § 10(b) violation, it is necessary to decide if the note in issue is a security covered by the 1934 Act. Specifically excluded from that Act's definition of a security in § 3(a)(10), 15 U.S.C. § 78c(a)(10), is "any note . . . which has a maturity at the time of issuance of not exceeding nine months." The Penn Central note purchased by Franklin from Goldman, Sachs had a maturity at time of issuance of slightly more than three months. If the statute were applied literally there could be no § 10(b) liability because the railroad's commercial paper would be outside the scope of the Act. However, as the parties recognize and the district court observed, this court in *Zeller v. Bogue Electric Manufacturing Corp.*, 476 F.2d 795, 800 (2d Cir.), cert. denied, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973), held that "the mere fact that a note has a maturity of less than nine months does not take the case out of Rule 10b–5, unless the note fits the general notion of 'commercial paper' reflected in the SEC Release." The release referred to is Sec. Act Release No. 4412 (1961), 17 C.F.R. § 231.4412, which deals with the exemption of a security from registration under the 1933 Act. *Zeller* followed *Sanders v. John Nuveen & Co.*, 463 F.2d 1075, 1079 (7th Cir.), cert. denied, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972), which had held that to be exempt from the anti-fraud provisions of the 1934 Act, the paper must be "(1) prime quality negotiable commercial

---

**10.** E. g., *Stern v. Satra Corp.*, 539 F.2d 1305, 1308–09 (2d Cir. 1976); 3 L. Loss, Securities Regulation 1436–38 (1961); W. Prosser, Torts § 109 (4th ed. 1971); see Jacobs, What Is a

Misleading Statement or Omission Under Rule 10b–5?, 42 Fordham L.Rev. 243, 279 n.199 (1973).

paper (2) of a type not ordinarily purchased by the general public, that is, (3) paper issued to facilitate well recognized types of current operational business requirements and (4) of a type eligible for discounting by Federal Reserve banks."

Judge Metzner applied this "four-prong" test to the Penn Central paper and found compliance with the last three criteria. However, he found the note not within the § 3(a)(10) exemption because it was not prime despite its rating as such by NCO. Judge Metzner's finding was based on the merits of the case which indicated that Penn Central was in a precarious financial plight on the date of the transaction on March 16, 1970. Appellants would have us overrule *Zeller* in light of subsequent Supreme Court cases such as *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (Powell, *J.*, concurring), which they interpret as requiring a literal reading of the 1934 Act. If we fail to take that drastic step, appellants alternatively urge that we read *Zeller* to hold that the 1934 Act does not apply to paper of the type normally sold in the commercial paper market. Judge Friendly, the author of *Zeller*, revisited the question in *Exchange National Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126 (2d Cir. 1976) and both parties to this appeal find encouragement in his further views.[11] This circuit has never considered the meaning of the term "prime quality",

and even those engaged in the business of dealing in commercial paper have difficulty in defining it.[12] The legislative history of the 1933 Act from which the SEC derived the test is sparse and unenlightening.[13] Other district courts construing Penn Central notes have either not reached the issue by finding no § 10(b) liability[14] or have loosely followed the four-prong test.[15] We do not reach this jurisdictional issue in any event. The finding that the 1934 Act was violated must be reversed on the merits, and the remand will be limited to § 12(2) of the 1933 Act in accordance with our directions in the concluding paragraph of this opinion.

## B.  Merits

The opinion of the district court was written prior to the Supreme Court's decision in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), where the Court announced that in order to find private damage liability under § 10(b) of the 1934 Act the plaintiff must establish "scienter" as a necessary element. Scienter in that case was defined to mean "a mental state embracing intent to deceive, manipulate, or defraud". Id. at 194 n.12, 96 S.Ct. at 1381. Here, the trial court made no finding that Goldman, Sachs intentionally withheld information from Franklin at the time of this transaction in an attempt to defraud the plaintiff. The court found that Goldman, Sachs was limiting its

---

**11.** In *Exchange National Bank* Judge Friendly explicitly left "for another day the status under the 1934 Act of a note with a maturity of nine months or less" that was purchased for investment purposes. 544 F.2d at 1138 n.19. That day still has not arrived.

**12.** Chicago Comment, *supra* note 3, at 386–87.

**13.** See Schweitzer, *supra* note 3, at 1251 n.29.

**14.** See *University Hill Foundation v. Goldman, Sachs & Co.*, 422 F.Supp. 879 (S.D.N.Y.1976).

**15.** In *Mallinckrodt Chem. Works v. Goldman, Sachs & Co.*, 420 F.Supp. 231, 240 (S.D.N.Y. 1976) the court found the notes not "issued to facilitate well recognized types of current operational business requirements" but to fund past capital expenditures. The court also applied the nature of the purchase test and found that

since the notes were purchased for investment and not commercial reasons they were securities under the 1934 Act. Id. at 240–41.

In *Alton Box Board Co. v. Goldman, Sachs & Co.*, 418 F.Supp. 1149, 1156 (E.D.Mo.1976), the court merely cited Judge Metzner's opinion below in finding the Penn Central commercial paper at issue was a security within the coverage of the 1934 Act.

In *Welch Foods Inc. v. Goldman, Sachs & Co.*, 398 F.Supp. 1393, 1398–99 (S.D.N.Y.1974), the district court found that the Penn Central notes failed to meet any of the Release's four criteria necessary under *Zeller* for exemption from the 1934 Act. In finding that the paper was not prime the court placed great emphasis on the fact of Penn Central's subsequent insolvency.

inventory in Penn Central paper through buy backs, that it knew both that there were insufficient bank credit lines for this paper still outstanding and that this paper had been removed from the approved list of Brown Brothers Harriman on February 5. Judge Metzner determined that these facts were material and that Goldman, Sachs was required to disclose them to Franklin. The court then concluded, "Having decided to sell the notes without disclosing these material facts, Goldman, Sachs is liable to the plaintiff for a violation of Section 10(b)." 406 F.Supp. at 47. It is apparent from a full reading of the opinion that the court never found that Goldman, Sachs possessed an intent to deceive, manipulate or defraud. Appellee does not argue that there was any such express finding but rather that the scienter required by *Ernst & Ernst* can be inferred from the facts found by the court. We do not believe that this is appropriate here, particularly since the trial court refused to admit testimony which had a decided bearing on the issue of the good faith *vel non* of Goldman, Sachs.[16] We reverse the finding of liability under § 10(b) but do not remand on that issue.

While Franklin below sought rescission and damages on a variety of claimed violations of common law and state and federal statutory provisions, see *supra* note 2, in any event its damages will be limited to $500,000 plus interest and costs. If Franklin cannot establish liability on the merits under § 12(2) of the 1933 Act, it can hardly establish liability under § 10(b) of the 1934 Act and Rule 10b–5 which require it to establish that Goldman, Sachs intended to defraud the bank. Rather than remand to retry the issue of intent under § 10(b) or to reconsider the issue of jurisdiction under the 1934 Act, possibly under some new formula adopted by this circuit, we think that logically and in the interests of judicial economy the remand should be limited solely to the merits of the § 12(2) claim. The judgment below is reversed and the matter remanded consistent with this opinion.

VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority that the judgment appealed from must be reversed and the matter remanded. However, I do not agree that the proper test of defendants' liability under § 12(2) is whether they exercised reasonable professional care in evaluating financial data.

Although § 12(2) is often spoken of as a negligence statute, this description is not completely accurate. Before defendants can be put to the burden of showing that they exercised reasonable care, plaintiff must first establish that they made an untrue statement of a "material fact" or omitted to state a "material fact" necessary in order to make the statements not misleading.

Construing an expression of opinion so as to make it a statement of fact requires some rather fancy legal footwork. This result has been accomplished most gracefully where the opinion is a forecast of future earnings. *See, e. g., Marx v. Computer*

---

16. At trial, Goldman, Sachs attempted to introduce evidence that Gustave L. Levy, senior partner of that firm was the trustee for a blind trust of Walter Annenberg, a close personal friend and then the American Ambassador to Great Britain, with sole discretion to buy and sell common stock held in the trust. The trust contained approximately 180,000 shares of Penn Central stock worth over $10 million. The evidence would have established that while Levy sold all other stock in the blind trust he nonetheless retained the Penn Central stock because he believed it was underpriced. In fact, he retained 160,000 shares of it until after the reorganization petition was filed and then ultimately sold it at a loss of many millions of dollars. Counsel for Goldman, Sachs urged the admission of this evidence as a "badge of innocent good faith" and the trial court rejected it stating, "I don't need it for this trial. Objection sustained." The rejection of this evidence gives credence to the position of the appellants that the court below did not consider "scienter" to be an element in the 10b–5 case. In finding that Goldman, Sachs had acted in good faith in *University Hill Foundation* the district court noted that it had based its conclusion on evidence, including the Annenberg trust, that had not been in the record before Judge Metzner. *University Hill Foundation v. Goldman, Sachs & Co., supra,* 422 F.Supp. at 895 n.15.

*Sciences Corp.*, 507 F.2d 485, 489 (9th Cir. 1974); *G. & M., Inc. v. Newbern*, 488 F.2d 742, 745–46 (9th Cir. 1973); *Ferland v. Orange Groves of Florida, Inc.*, 377 F.Supp. 690, 705 (M.D.Fla.1974). Where the statement in question is a pure expression of opinion, as distinguished from a forecast, it is a contradiction in terms to call it a statement of fact. *See Anderson v. Knox*, 297 F.2d 702, 720–21 (9th Cir. 1961), *cert. denied*, 370 U.S. 915, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962); *Myzel v. Fields*, 386 F.2d 718, 734 n.8 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Rotstein v. Reynolds & Co.*, 359 F.Supp. 109, 113 (N.D.Ill.1973); *Bowman v. Hartig*, 334 F.Supp. 1323, 1328 (S.D.N.Y.1971); *Phillips v. Reynolds & Co.*, 294 F.Supp. 1249, 1256 (E.D.Pa.1969). The "material fact" in such instance is that the speaker honestly holds the opinion which he has expressed. 1 A. Bromberg, Securities Law § 5.3, at 97 (1967). In *Hanly v. SEC*, 415 F.2d 589, 596–97 (2d Cir. 1969), we held that a securities dealer implicitly represents that he has an adequate basis for his opinions. However, in that SEC initiated action we merely tracked the language of SEC releases No. 34–6721 and No. 33–4445, issued February 2, 1962; and we specifically stated that this "implied warranty" may not be as rigidly enforced in a private action for damages.

In the instant case, events subsequent to plaintiff's purchase have proven that the defendants' opinion, implied rather than expressed,[1] concerning the credit-worthiness of Penn Central paper was probably in error and that defendants' potential exposure is tremendous, running into many millions of dollars.[2] Requiring defendants to prove, "in the bright gleam of hindsight", *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 867 (2d Cir. 1968) (Friendly, J., concurring),

*cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), that they exercised reasonable professional care in arriving at their erroneous opinion, places upon them an almost insurmountable burden. The better rule, I submit, would place upon the defendants the burden of proving that their opinion was based upon a review of the pertinent available data and was held honestly and in good faith. If the defendants' opinion was thus held honestly and in good faith, there was no misstatement of a material fact; and there is no need to reach the issue of negligence.

It is seldom that the purchaser of stock does not secure from his broker some expression of opinion concerning the wisdom of the purchase. If each such opinion is construed to be a statement of material fact, the next substantial break in the securities market may well put most brokers out of business. While it is possible that "[r]epresentations as to value, soundness and worth of securities . . ." may, in some instances, show much more than ". . . the mistaken judgment of [an] honest man . . .," *Holmes v. United States*, 134 F.2d 125, 133 (8th Cir. 1943), the proper measure of culpability should not be whether other dealers might reasonably have arrived at another judgment.

---

1. The District Court found that plaintiff purchased the Penn Central note without question when it was offered for sale. 406 F.Supp. at 46. He concluded, however, that "[w]hen Goldman, Sachs sold this paper, it was *understood* that it was holding out the paper as credit-worthy and high quality." *Id.* at 46–47. (Emphasis added).

2. There are at least fifteen such cases pending against these defendants in the Southern District of New York and a substantial number in other District Courts. *See Welch Foods, Inc. v. Goldman, Sachs & Co.*, 398 F.Supp. 1393, 1402 (S.D.N.Y.1974).